**Martina SHERIFF, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

**No. 08–1645.**

United States Court of Appeals, Third Circuit.

Argued: Sept. 21, 2009.

Opinion Filed: Nov. 24, 2009.

Dennis Mulligan, Esq. (Argued), Nationalities Service Center, Philadelphia, PA, for Petitioner.

Susan B. Green, Esq. (Argued), Richard M. Evans, Esq., Lindsay B. Glauner, Esq., Angela N. Liang, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: BARRY, FISHER and JORDAN, Circuit Judges.

## OPINION OF THE COURT

BARRY, Circuit Judge.

This is a case of almost unimaginable horrors inflicted on a Liberian woman by supporters of former Liberian president, Charles Taylor. Those horrors, which include witnessing the murder of her mother and the rape of her daughter, who later died; the abduction of her other daughter, now presumed dead; and her own capture and detention, during which time she was bound with electrical wire and raped multiple times, prompt us, as a matter of first impression for our court, to consider, among other issues, what has come to be known as "humanitarian asylum."

Some background is in order. The Republic of Liberia is a country with a violent and, indeed, sordid past. Charles Taylor was elected president in 1997 after years of leading a bloody insurgency against the Liberian government, various militias, and the civilian population. It was an authoritarian rule, notable for its brutality, ending in August 2003 when Taylor resigned as President, and was exiled to Nigeria. He was later indicted for, *inter alia*, crimes against humanity by the Special Court for Sierra Leone. In November 2005, Ellen Johnson–Sirleaf was elected president, becoming Africa's first elected female head of state.

Martina Sheriff ("Sheriff") is a 48 year-old native and citizen of Liberia, with no formal education. She is a Muslim and a member of the Mandingo tribe, a group that, beginning in late–1989, was targeted and savaged by the National Patriotic Front of Liberia ("NPFL"), rebels led by Taylor. The savagery continued throughout Taylor's rule as President and, if Sheriff is to be believed—and there is no sug-

gestion she should not be—even after he was removed from office.

In 1990, NPFL rebels entered Sheriff's village and massacred more than 400 Mandingos, including women and children. Sheriff's mother was murdered and her oldest daughter, Mawata, was raped in front of her. The girl later died. Her house was burned to the ground, bodies were strewn everywhere, and the rebels had run amok. As the atrocities and mass confusion continued, Sheriff and her family escaped to Guinea, returning home only when a peacekeeping force was deployed to her home area.

In 1997, Sheriff joined the All–Liberia Coalition Party ("ALCOP"), a political party opposed to Taylor and supporting the interests of the Mandingos. ALCOP was headed by Alhaji Kromah, a Mandingo. Sheriff was head of its women's wing in the area in which she lived. After Taylor's election, Sheriff was hunted by his forces because she had supported Kromah and was a Mandingo.

In September 1998, Taylor's forces again raided Sheriff's village and arrested her, along with others, accusing them of being spies for Kromah. Sheriff was beaten, treated as a slave, tied with electrical wire, raped by four of her captors over the period of a week or two, and almost died. She was released through the intervention of religious leaders, and again fled to Guinea. She returned home in April 1999 in an effort to take her father, a teacher of religion, to Guinea to care for him after he was arrested, tortured, and shot in the leg by Taylor's forces because they believed he had prayed that Kromah would win the election. He was not allowed to leave, and died of his wounds. Sheriff's village was still engulfed in rebel fighting, and the atrocities continued. During that fighting and the confusion that ensued, Sheriff's daughter, Massa, was abducted and is presumed dead.

Sheriff took her remaining children and escaped for a final time to Guinea, but Liberian forces invaded the town in which she was living, beat her, and shot and killed the woman who was caring for her, as well as a number of other people. Sheriff fled Guinea and entered the United States on May 15, 2001, using the dead woman's passport. She was charged as removable under 8 U.S.C. § 1227(a)(1)(B) and 8 U.S.C. § 1227(a)(3)(C), and conceded removability. She has been seeking asylum, withholding of removal, and relief under the U.N. Convention Against Torture ever since, alleging persecution on account of her Mandingo ethnicity and her membership in a political party that opposed the rule of Charles Taylor. She explained why:

Q.  [N]ow, what do you think would happen to you, Martina, if you were to return to Liberia today?

A.  When I go back, they will kill me.

Q.  Why do you think that would happen?

\* \* \*

A.  They still searching for me.

Q.  Who is?

A.  People that cause me to come here.

Q.  Okay.

A.  Charles Taylor people.

Q.  Okay, you understand Charles Taylor is no longer the president of Liberia?

A.  Yes, I know.

Q.  With him no longer being power, in office, why do you fear Charles Taylor or his people?

A.  The people he left in power, they still there. They never leave.

Q. Okay, and why do you think those people would want to harm you if you returned?

A. They will kill me.

\* \* \*

Q. Why?

A. Being Mandingo.

(App. 153–54.)

On April 24, 2006, the Immigration Judge ("IJ") found Sheriff to be credible and granted her application for asylum, concluding, first, that the government had not rebutted the presumption of a well-founded fear of future persecution, and, second, that even if it had, Sheriff had demonstrated reasons so compelling that humanitarian asylum was warranted under 8 C.F.R. § 208.13(b)(1)(iii). The Department of Homeland Security ("DHS") appealed to the Board of Immigration Appeals ("BIA") which, on February 5, 2008, sustained the appeal, one member dissenting (without opinion), and denied Sheriff's applications for asylum, withholding of removal and relief under the Convention Against Torture.

The BIA did not disturb the IJ's credibility finding, but took administrative notice of the 2006 U.S. Department of State Country Reports for Liberia ("Country Reports") and concluded that there had been a "fundamental change in country conditions" since the 2000 Country Reports in the record [1] and the November 2004 hearing before the IJ, and that the presumption of a well-founded fear of persecution had, therefore, been rebutted. (App. at 4.) The BIA also found that, although Sheriff's "mistreatment was despicable," *id.*, humanitarian asylum was not warranted because she had not shown compelling reasons for being unable or unwilling to return to Liberia.

Sheriff timely petitioned for review, pressing only her claim for asylum, and we stayed her removal. We will grant the petition and remand to the BIA for reasons we will explain below. We note here, however, that what underlies almost all of what will follow is the utter failure of the BIA to apparently even consider, much less discuss, many if not most of the atrocities to which Sheriff was subjected; her testimony that she will be killed if she is returned to Liberia, and why; and the documentary evidence in the case. The BIA was not entitled to simply ignore such a powerful presentation and summarily conclude that the presumption had been rebutted and that humanitarian relief was not in order.

## I.  *Jurisdiction and Standard of Review*

■ The BIA had jurisdiction to hear DHS's appeal of the IJ's decision pursuant to 8 C.F.R. § 1003.1(b)(3). We have jurisdiction pursuant to 8 U.S.C. § 1252(a). Because the BIA issued its own decision, we review that decision, and not that of the IJ. *Ezeagwuna v. Ashcroft*, 301 F.3d 116, 126 (3d Cir.2002).

■ We will affirm "the Attorney General's discretionary judgment whether to grant relief under [the asylum statutes]" unless that judgment was "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(d). More specifically, the BIA's determinations will be upheld if they are supported by reasonable, substantial, and probative evidence in the record considered as a whole. *Yusupov v. Att'y Gen.*, 518 F.3d 185, 197 (3d Cir.2008). Under the substantial evidence standard, the BIA's determinations "must be upheld unless the evidence not only

---

1. The IJ's comments at the hearing (App. at 99) indicate that he was also in possession of

the 2003 Country Reports, although that document does not appear in the record.

supports a contrary conclusion, but compels it." *Abdille v. Ashcroft,* 242 F.3d 477, 483–84 (3d Cir.2001); *Chavarria v. Gonzalez,* 446 F.3d 508, 515 (3d Cir.2006). However, as just suggested, "the BIA must substantiate its decisions. We will not accord the BIA deference where its findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record." *Id.* (internal citations and quotations omitted).

## II. *Legal Standards*

On appeal, Sheriff argues that the BIA erred in concluding that DHS rebutted the presumption of future persecution. This argument is based not only on the evidence of record that was *not* considered by the BIA but on the fact that the BIA considered Country Reports that were not in the record and that it applied the wrong standard of review. Sheriff also claims that, regardless of whether the presumption had been rebutted, the BIA erred in concluding that she was not eligible for humanitarian asylum.

▇ "The Attorney General 'may' grant asylum to an alien who demonstrates that he/she is a refugee." *Gao v. Ashcroft,* 299 F.3d 266, 271 (3d Cir.2002) (quoting 8 U.S.C. § 1158(b)(1)). A refugee is a "person unable or unwilling to return to the country of that person's nationality or habitual residence because of past persecution or because of a well-founded fear of future persecution on account of h[er] race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at 271–72 (citing 8 U.S.C. § 1101(a)(42)(A)). Persecution "must amount to more than generally harsh conditions shared by many other persons, but does include threats to life, confinement, torture, and economic restrictions so se-

vere that they constitute a real threat to life or freedom." *Lin v. INS,* 238 F.3d 239, 243–44 (3d Cir.2001) (internal citations and quotations omitted). The applicant bears the burden of establishing that he or she meets the prerequisites for status as a refugee. *See* 8 C.F.R. § 208.13(a) ("The burden of proof is on the applicant for asylum to establish that he or she is a refugee ...."); *see also Ezeagwuna,* 301 F.3d at 127.

▇ To be eligible for asylum on the basis of past persecution, the applicant must show "(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Gao,* 299 F.3d at 272 (quoting *Navas v. INS,* 217 F.3d 646, 655 (9th Cir. 2000)). It is undisputed that Sheriff has met the requirements for past persecution, which was perhaps why the BIA gave the back of its hand to much of the evidence of record. The burning of Sheriff's home and the murder of her mother and rape of her eldest daughter in front of her were among the atrocities not mentioned by the BIA because, we are told, it was not required to mention every "detail," as the government somewhat cavalierly describes them. (Appellee's Br. at 37.)

An applicant who has established past persecution shall be presumed to have a well-founded fear of persecution on the basis of the original claim. That presumption may be rebutted, however, if an immigration judge finds that there has been a fundamental change in circumstances in the native country such that the applicant no longer has a well-founded fear of persecution.[2] *See* 8 C.F.R. § 208.13(b)(1)(i).

---

**2.** An applicant can also establish himself or herself as a refugee on the basis of a well-

founded fear of persecution alone if there "is a reasonable possibility of suffering such per-

"The burden of proof in a changed-country-conditions rebuttal is on the government." *Berishaj v. Ashcroft,* 378 F.3d 314, 327 (3d Cir.2004) (citing 8 C.F.R. § 208.13(b)(1)(ii)).

Even if the presumption of future persecution is rebutted, an applicant can still be granted asylum if he or she "has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution" or "has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 208.13(b)(1)(iii).

### III. *Discussion*

#### A. *Has the Presumption Been Rebutted?*

■ The government does not take issue with the unremarkable proposition that the IJ was required to consider the record as a whole in evaluating Sheriff's application for asylum, nor does it suggest that the IJ did not do just that. Neither does the government argue that it rebutted the presumption of a well-founded fear of persecution before the IJ, nor could it because its only submissions to the IJ were two 2004 articles from the BBC website—"Liberia moves against Taylor aides" and "New call for Taylor to face trial." Thus, what is before us is the one paragraph of the BIA's decision addressing whether, in light of changed country conditions, the presumption was rebutted before it, a paragraph in which the BIA completely ignored the record and faulted the IJ only for not "citing to any particular documents" as to two of the IJ's numerous findings, *i.e.* that "Mr. Taylor still has supporters in Liberia" and that "the situa-

tion outside of Monrovia is still delicate." (App. at 4.) We stress that the BIA did not say, because it could not say, that evidence of those findings was not in the record, but only that the IJ did not specify where in the record that evidence could be found. A slender reed, indeed.

Those "particular documents" and their location in the record aside, the BIA ignored Sheriff's gripping testimony that Taylor's people are still in power, are searching for her, and will kill her if she returns. That testimony, we note, was corroborated by, among other evidence that went unmentioned, the affidavit of Shelkh K.M. Sackor, in which Ms. Sackor explained that Taylor still has power in Liberia—his former Defense Minister for six years, for example, is Defense Minister in the new administration, his Chief of Operations at the Liberian National Police is an Assistant Justice Minister, and both rebel and government forces continue to extort and frighten individuals, giving Sheriff "legitimate cause for fear of her life if she returns." (*Id.* at 208.) In terms of security for civilians such as Sheriff, Ms. Sackor concluded, "everything is degenerating by the day." (*Id.* at 209.)

Ignoring the evidence before the IJ that was relevant to whether the presumption was rebutted, much of which was referenced in the IJ's opinion in April 2006, the BIA, in its one paragraph discussion, took administrative notice of the 2006 Country Reports. Based on that, and nothing more, the BIA concluded as follows:

> [W]e find that conditions in Liberia have materially changed.... The Country Reports state that the government of Liberia generally respects the human rights of its citizens and is taking signifi-

secution if ... [the applicant] were to return to [the] country," and "[the applicant] is unable or unwilling to return to ... [the] coun-
try because of such fear." *Id.* § 208.13(b)(i)(2)(B) & (C). This provision is not pressed on this appeal.

cant steps to correct past human rights deficiencies. While the Country Reports indicate that problems still exist in some areas, and deaths from mob violence have increased, there is no indication that persons who opposed Charles Taylor are persecuted by the current government or remaining Charles Taylor supporters.

(*Id.* at 4 (citing 2006 Country Reports).)

It is certainly clear from the 2006 Country Reports that conditions in Liberia had (and have) changed in important ways since the time of Sheriff's persecution: Taylor is no longer in office and is on trial for war crimes in another country, and the democratically-elected government in Liberia has made strides in the direction of improving human rights. But, as we said in *Berishaj*, general evidence of improved country conditions will not suffice to rebut credible testimony and other evidence establishing past persecution; evidence of changed country conditions can successfully rebut the presumption *only* if it addresses the specific basis for the alien's fear of persecution. 378 F.3d at 327–28. The 2006 Country Reports are silent as to the fact and/or strength of Taylor's remaining supporters; indeed, Taylor's name appears only twice in the fifteen-page Country Reports, once to note that the government arrested twenty of his associates on suspicion of plotting against the government, and once to recite the historical fact that Taylor was transferred to Sierra Leone to face war crimes charges emanating from that country's civil conflict. The Country Reports surely do not suggest that Taylor supporters are no longer roaming the country or Sheriff's region and no longer pose a threat to her. The BIA does not tell us why the IJ's specific findings in those regards were rejected even as it accepted the IJ's finding that Sheriff testified credibly as to them. It certainly seems questionable, at least to us at this juncture, that the general evidence of an improved human rights situation relied upon by the BIA, combined with the fact that Taylor no longer holds office, was enough to rebut the presumption.

We do not mean to suggest that the BIA was not within its rights to consider the 2006 Country Reports even though those Reports were not part of the record before the IJ.[3] In *Berishaj*, we expressed our strong displeasure with the state of affairs presented by our appellate review of BIA decisions. Too frequently, we complained, the BIA was relying upon outdated and antiquated Country Reports not reflective of the state of affairs even at the time of the BIA's decision. *See id.* at 328–31 (discussing the problems presented by stale administrative records in asylum cases, and noting that "[i]t has become common that ... country reports in the administrative record are three or four years old by the time the petition for review comes before us"). Accordingly, we urged the BIA to make greater use of procedures allowing for the reopening of proceedings based on new facts, and also urged the BIA "to adopt—by opinion, regulation, or otherwise—policies that will avoid the Court of Appeals having to review administrative records so out-of-date as to verge on meaningless." *Id.*[4]

---

3. Whether a petitioner has a due process right to notice and an opportunity to be heard before the BIA takes administrative notice of Country Reports is a separate issue, and one that we need not address. *See* note 5, *infra.*

4. *Cf. Janusiak v. INS,* 947 F.2d 46, 48 n. 1 (3d Cir.1991) ("The [BIA] often aids courts of appeals by taking administrative notice of important facts about the country in question. This aid is often a part of our decision-making, since defining persecution is an elusive

There is a regulation that does exactly that. 8 C.F.R. § 1003.1(d)(3)(iv) provides that "[e]xcept for taking administrative notice of commonly known facts such as current events or the contents of official documents, the [BIA] will not engage in factfinding in the course of deciding appeals." The commentary to this regulation explicitly envisions that the BIA will consider Country Reports:

> Section 3.1(d)(3) . . . generally prohibits the introduction and consideration of new evidence in proceedings before the Board, except for taking administrative notice of commonly known facts such as current events, *or the contents of official documents such as country condition reports prepared by the Department of State.*

67 Fed.Reg. 54878, 54891 (August 26, 2002) (emphasis added).

> The Department intends by use of [this regulatory language, *supra*] to make clear that the [BIA] may take administrative notice not only of current events but also of the contents of official documents such as the country condition reports prepared by the Department of State, including its foreign policy expertise, analysis, and opinion.

*Id.* at 54892.

As we noted at the outset, we will not accord deference to the findings and conclusions of the BIA that are not reasonably grounded in the record. It is at *best* a close call as to whether the 2006 Country Reports provide the type of specific evidence of improvement in country condi-

tions that would rebut the presumption of future persecution, and we have already bemoaned the BIA's failure to address Sheriff's evidence in that regard. We will remand to the BIA when it has failed to adequately consider the evidence in the record which favors an applicant. *See Tipu v. INS*, 20 F.3d 580, 583 (3d Cir. 1994). In light of the questionable basis on which the BIA rejected the IJ's findings, we will do so here. We assume that on remand the parties will have an opportunity to address the effect, if any, of the most recent County Reports.[5] This assumption prompts us to note the rather pointed reminder to the BIA by one of our sister courts of appeals not to treat Country Reports, "as is its tendency, as Holy Writ." *Galina v. INS*, 213 F.3d 955, 959 (7th Cir.2000).

Because we will remand, we believe it appropriate to briefly discuss the standard of review that the BIA is required to apply to its determination that DHS did or did not rebut the presumption of a well-founded fear of persecution, because it is far from clear that it applied that standard on its initial review. For all appeals to the BIA filed on or after September 25, 2002, the determination as to whether certain facts give rise to a well-founded fear of persecution is governed by a *de novo* standard of review, but the clearly erroneous standard applies to the fact-finding that undergirds that determination. *Compare* 8 C.F.R. § 1003.1(d)(3)(i) ("The Board will not engage in *de novo* review of findings of facts. . . . Facts determined by the immi-

---

and precise task, one that is at the margins perhaps uniquely political in nature.").

5. Given this assumption, we need not reach Sheriff's argument that she had a due process right to notice and an opportunity to be heard before the BIA took administrative notice of the 2006 Country Reports. It follows, therefore, that we need not decide whether the fact

that earlier Country Reports were in the record before the IJ and/or cited to the BIA by Sheriff should be deemed adequate notice of the 2006 Country Reports. We note that what constitutes adequate notice and an opportunity to be heard and what would cure a lack of notice are issues as to which the courts of appeals are currently divided.

gration judge ... shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.") *with id.* § 1003. 1(d)(3)(ii) ("The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges *de novo.*").

Thus, the BIA erred if it imposed a *de novo* standard of review on findings about conditions in Liberia, but not if it imposed a *de novo* standard on whether certain conditions legally constitute a rebutted presumption of a well-founded fear of future persecution. The BIA's reasoning in this area was sparse:

> With regard to a well-founded fear of persecution, we find that, even assuming the respondent experienced past persecution, the presumption of a well-founded fear of persecution has been rebutted because the preponderance of the evidence demonstrates that there has been a fundamental change in circumstances such that the respondent no longer has a well-founded fear of persecution.

(App. at 4.)

It is difficult, if not impossible, to determine what standard of review the BIA applied, and to what determinations. We expect that on remand, the BIA will make this clear.

### B. *Humanitarian Asylum*

We turn, finally, to humanitarian asylum and the regulation which provides the opportunity for humanitarian asylum in one of two ways. That regulation, 8 C.F.R. § 208.13(b)(1)(iii), states, in relevant part, that an applicant who has suffered past persecution and who does not face a reasonable possibility of future persecution may be granted asylum if he or she has demonstrated "compelling reasons for being unwilling or unable to return to that country arising out of the severity of the past persecution," 8 C.F.R. § 208.13(b)(1)(iii)(A), *or* has established "that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country...." 8 C.F.R. § 208.13(b)(1)(iii)(B). Only the first of these subsections (and its predecessor) has received more than passing mention in the caselaw or any interpretation by the BIA, and we have not had the occasion to address either subsection in a precedential opinion.

Humanitarian asylum based on the severity of past persecution alone—the (A) subsection of the regulation—is also known as *"Matter of Chen"* asylum. *See In re Matter of Chen,* 20 I. & N. Dec. 16, 18 (BIA 1989) ("[I]t is clear from the plain language of the statute that past persecution can be the basis for a persecution claim."). The Court of Appeals for the Ninth Circuit explained its view: "The *Matter of Chen* exception is an expression of humanitarian considerations that sometimes past persecution is so horrific that the march of time and the ebb and flow of political tides cannot efface the fear in the mind of the persecuted." *Lal v. INS,* 255 F.3d 998, 1009 (9th Cir.2001).[6]

---

**6.** In *Matter of Chen,* which was codified in the initial regulation, the BIA granted humanitarian asylum to a victim of the Chinese Cultural Revolution. The applicant's father was a Christian minister who had been attacked, beaten, forced to write false confessions, and badly burned after being pushed into a bonfire of burning Bibles. The applicant himself, at the age of 8, was kept in a locked room with his grandmother for over six months, not permitted to attend school, and refused food when he would cry. After being released from confinement, he had rocks thrown at him and suffered serious physical injuries, including a permanent one requiring him to wear a hearing aid. Later, he was sent away from home for reeducation, where he was subject to a new variety of abuses.

594

There is consensus among those few courts of appeals that have weighed in on the question of how severe the past persecution must have been before an applicant is eligible for *Matter of Chen* asylum that it must have been extreme indeed. The Court of Appeals for the Ninth Circuit set the standard as follows: "Absent a likelihood of future persecution, asylum is warranted [under this subsection] only if [the applicant] demonstrates that in the past he or his family has suffered under atrocious forms of persecution." *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir.1995) (internal citations, quotations, and alterations omitted); *see also Lopez–Galarza v. INS*, 99 F.3d 954, 961–62 (9th Cir.1996) (reiterating standard) (noting that "rape at the hands of government authorities while imprisoned on account of one's political views can be an atrocious form of punishment indeed," and remanding to the BIA for consideration of whether a Nicaraguan woman's confinement, rape, and vandalism of her home were sufficiently atrocious to warrant humanitarian asylum.) [7]

■ The Courts of Appeals for the Fourth and Seventh Circuits have similarly reserved humanitarian asylum based on past persecution for the most atrocious abuse. *See Bucur v. INS*, 109 F.3d 399, 405 (7th Cir.1997) (finding humanitarian asylum based on persecution alone was "designed for the case of the German Jews, the victims of the Chinese 'Cultural Revolution,' survivors of the Cambodian genocide, and a few other such extreme cases") (internal citation omitted); *Gonahasa v. INS*, 181 F.3d 538, 544 (4th Cir. 1999) (denying humanitarian asylum based on persecution alone where applicant was detained for two weeks, beaten, and cut with bayonets by government police, and limiting it to " 'the rare case where past persecution is so severe that it would be inhumane to return the alien even in the absence of any risk of future persecution' ") (quoting *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir.1997)).

We see little support, in those few instances in which the BIA has interpreted "severity of the past persecution," for limiting humanitarian asylum under subsection A to victims such as those of the Holocaust, the Chinese Cultural Revolution, the survivors of Cambodian genocide, or those who have suffered similar atrocious abuse, as those early cases explicitly or implicitly have done, although we recognize that, particularly given its citation to *Bucur*, the BIA, albeit without discussion, appeared to have so limited it here. That having been said, there can be no dispute that severe *means* severe, as evidenced by the Supplementary Information to the proposed rule regarding procedures for asylum and withholding of removal published in the Federal Register on June 11, 1998.

After finding that since the time of the Cultural Revolution, country conditions in China had changed substantially, the BIA found itself unpersuaded "that a reasonable person in [the applicant's] circumstances would have a well-founded fear of persecution on account of his religion." 20 I. & N. Dec. [at 21] The BIA nonetheless granted asylum, finding that the severity of the applicant's past persecution was such that, despite the changed country conditions, he was statutorily eligible and entitled to remain in the United States. *Id.* at 21–22.

7. *And see Vongsakdy v. INS*, 171 F.3d 1203 (9th Cir.1999) (reversing BIA and finding Laotian man who was imprisoned in a work camp for several years, beaten, harassed, and tortured eligible for humanitarian asylum); *Lal v. INS, supra* (finding Hindu–Fijian man who was repeatedly detained, beaten, burned with cigarettes, deprived of food and water, forced to drink urine and eat meat even though a Hindu-vegetarian, and forced to watch as government soldiers sexually assaulted his wife, eligible for humanitarian asylum).

63 Fed.Reg. 31945, 31947. In that Supplementary Information, the Department of Justice ("Department") recognized that it was possible to interpret the citation of certain of its decisions in *Matter of H-*, Interim Decision # 3276 (BIA 1996), as indicating that asylum could be granted based on "general humanitarian factors, unrelated to the [past persecution], such as age, health, or family ties," rather than on "compelling reasons arising out of the severity of the past persecution." *Id.* To avoid any such possibility, the Department amended the then-existing regulation to underscore that a grant of *Matter of Chen* asylum is allowed *only* where there are compelling reasons related to the severity of the past persecution, providing relief to those who have suffered worst.

The BIA disposed of Sheriff's humanitarian asylum claim in one sentence, describing her "mistreatment" as "despicable," but finding that she had not established compelling reasons for otherwise being unable or unwilling to return to Liberia. If the BIA based its finding that she was unable or unwilling to return only on the few incidents of "mistreatment" it mentioned at the outset of its opinion, it may or may not have been correct.[8] But the BIA failed to discuss, and we have no way of knowing if it even considered, the evidence that Taylor's forces burned Sheriff's home to the ground, murdered her mother and raped her daughter in front of her, shot her father and then refused to allow him to leave the country for medical treatment, abducted her other daughter, and murdered the woman with whom she was staying in Guinea. These events, and the credible, uncontradicted and very specific testimony of Sheriff as to why she fears returning to Liberia, are important parts of the totality of the circumstances that were before the BIA when it reviewed the IJ's grant of humanitarian asylum, but the BIA did not mention any of it. It will have the opportunity to consider those circumstances on remand.

We mentioned above the proposed rule published in the Federal Register on June 11, 1998. This rule, which amended the eligibility requirements for victims of past persecution seeking asylum, became final on December 6, 2000 and effective on January 5, 2001. 65 Fed.Reg. 76,121, 76,133. This amendment of the then-existing regulation is highly relevant and of potential seminal importance to this case and, one would think, to numerous other cases. Surprisingly, however, the amendment has rated few mentions in the caselaw and no mention at all by the BIA in any interpretative statement. Codified at 8 C.F.R. § 208.13(b)(1)(iii)(B)—the (B) subsection—the amendment provides a second avenue of relief, a clearly liberalized alternative route to humanitarian asylum for an applicant who has suffered past persecution but does not face a reasonable possibility of future persecution. That applicant, the amendment provides, may be granted asylum if there is a "reasonable possibility that he or she may suffer other serious harm upon removal to that country...."

In the Supplementary Information to the proposed rule, the Department ex-

---

**8.** The BIA did note that Sheriff was raped by four of her captors. We have previously discussed the serious nature and consequences of rape in the immigration context. *Zubeda v. Ashcroft*, 333 F.3d 463, 472 (3d Cir.2003) ("Rape can constitute torture. Rape is a form of aggression constituting an egregious violation of humanity.... The effects of rape appear to endure for months or even years.... Moreover, courts have equated rape with conduct recognized under the law of nations as torture.") (internal citations and quotations omitted).

plained why it was doing what it did. It indicated its recognition of the fact that the "compelling reasons" related to "the severity of the past persecution" regulation—the only regulation pertaining to humanitarian asylum at the time—"may represent an overly restrictive approach to the exercise of discretion in cases involving past persecution, but no well-founded fear of future persecution." Thus, "[t]he Department believes it appropriate to broaden the standards for the exercise of discretion in such cases" and "the rule includes as a factor relevant to the exercise of discretion, whether the applicant may face a reasonable possibility of 'other serious harm' upon return to the country of origin or last habitual residence." The Department went on to define "other serious harm": "harm that may not be inflicted on account of race, religion, nationality, membership in a particular social group, or political group," but harm "so 'serious' as to equal the severity of persecution." But the Department did not stop there. Rather, in a far cry from what was required under the then-existing regulation, it carved out only two comparatively minor harms, stating that "mere economic disadvantage or the inability to practice one's chosen profession would [not] qualify as 'other serious harm.'"

While those two examples may not pass muster, one can imagine many that will. In, for example, one of the only cases to have even referenced the "serious harm" subsection, the Court of Appeals for the Seventh Circuit, although finding that the serious abuses endured by the applicant and the attendant effects on his mental health did not equate with the "truly heinous abuses" required under the severity of the past persecution subsection, remanded to the BIA to determine whether the applicant qualified for humanitarian relief based on his past persecution and the possibility of other serious harm:

[T]he record suggests that, if returned to Russia, Mr. Kholyavskiy would be without the only medications that effectively have controlled the symptoms of his mental illness and would be incapable of functioning on his own. It also is highly questionable whether he would be able to obtain housing and medical treatment. . . . *Debilitation and homelessness both would appear to constitute serious harms for purposes of 8 C.F.R. § 1208.13(b)(iii)(B).*

*Kholyavskiy v. Mukasey,* 540 F.3d 555, 577 (7th Cir.2008) (emphasis added).

The BIA, which has not heretofore interpreted subsection (B), will have the opportunity to do so on remand, and determine whether it is "reasonably possible" that the harm Sheriff faces is "serious." If debilitation and homelessness are "serious" enough, one wonders how the harms Sheriff faces and to which she credibly testified, such as the possibility or probability of being murdered, could not be "serious," but we leave that to the BIA in the first instance, and leave to it the decision as to whether further development of the record is necessary.

## IV. *Conclusion*

The petition for review will be granted and the case remanded to the BIA. On remand, the BIA must evaluate, in accordance with this Opinion, whether relief should be granted either because the government has not rebutted the presumption of future persecution or because Sheriff has established that humanitarian asylum should be granted.