NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3408
_____

VLADISLAV PAVLOV a/k/a Vladislav Vladimirovich Pavlov;
DANIL PAVLOV;
ILYA PAVLOV,
Petitioners

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Appeal for Review of an Order of the
Board of Immigration Appeals
(Agency Nos. A201-139-917, A201-139-918, A201-139-919)
Immigration Judge: Steven A. Morley
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 17, 2015

Before:  SMITH, JORDAN and VAN ANTWERPEN, *Circuit Judges*.

(Opinion Filed: June 9, 2015)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

VAN ANTWERPEN, *Circuit Judge*.

Vladislav Pavlov ("Pavlov") and his sons Danil Pavlov ("Danil") and Ilya Pavlov ("Ilya") filed this Petition for Review of the decision of the Board of Immigration Appeals ("BIA"), dated June 27, 2014, affirming the Immigration Judge's ("IJ") September 20, 2012 denial of their collective application for asylum, withholding of removal, and protection under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Because substantial evidence supported the IJ's finding that Pavlov's testimony was not credible and that petitioners did not have a well-founded fear of future persecution, we will deny the Petition for Review.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because we write for the parties, we will only set forth the facts as necessary to inform our analysis. Pavlov, a native and citizen of Turkmenistan, is the lead petitioner in this case. Pavlov's sons, Danil and Ilya, are also natives and citizens of Turkmenistan and are derivatives of Pavlov's petition. Pavlov and his sons are ethnically Russian. This appeal arises from Pavlov's alleged past persecution in Turkmenistan based on his Russian ethnicity and his fear of future persecution if his family is required to return to Turkmenistan.

The following description of events leading to the Pavlov family's departure from Turkmenistan for the United States in 2010 is based on Pavlov's account of those events. After the fall of the Soviet Union, Pavlov and his now ex-wife, Elena Pavlova ("Elena"), also an ethnic Russian, began to experience harassment and

2

verbal abuse in public places. In October 1994, Pavlov was fired from his job as a mechanic on account of his Russian ethnicity. Pavlov then began to sell records and videotapes at a marketplace to earn money. He and other Russian vendors had to bribe Turkmen police officers in order to remain open.

In December 1996, two men stole Elena's purse, but the police refused to take a report of the incident because of her ethnicity. A second incident occurred in 1996, when Pavlov and a friend were riding in a taxicab and the cab driver picked up another passenger. The police stopped the cab and discovered that the new passenger had drugs. The police beat Pavlov and his friend, even though they were not involved in the illegal activity.

In 1999, Pavlov opened an office in Turkmenibad for a company that gave seminars—mainly attended by ethnic Russians—to help people find jobs. Government officials demanded bribes and harassed Pavlov for not hiring more Turkmen employees. Eventually the Assistant Mayor of Turkmenibad asked Pavlov to shut down his business in order to prevent him from publicizing employment problems, particularly among the ethnic Russian community.

In 2002, Elena took Ilya to a playground where she was attacked by Turkmen women who told her that ethnic Russians did not belong there. Pavlov then went to the playground to confront the women. When he arrived, three Turkmen men tried to fight him, called him a "Russian pig," and told him to go back to Russia. (IJ[1] at 41).

---

[1] "IJ" refers to the September 20, 2012 decision of the Immigration Judge in this matter. This decision begins at page 37 of the Appendix to the Appellant's Brief.

In August 2004, police officers harassed Pavlov while he was waiting outside of a store for a friend to finish shopping. Pavlov and his friend were then arrested, taken to the police station, and released from custody approximately eight hours later. The police spoke negatively about Pavlov's ethnicity. They told him that the power of the Soviet Union had ended and that it was time to live according to Turkmen laws.

Elena moved to the United States in May of 2004 because of the incident at the playground. In June 2007, police interrogated Pavlov about Elena because she applied for asylum in the United States. The police asked if she had anything against the Turkmen government or president. The police threatened that if Pavlov did not divorce Elena, they would imprison Pavlov and place his children in a foster home. Pavlov and Elena decided that they should divorce for the family's safety. Elena subsequently filed for and obtained a divorce from Pavlov in the United States.

On August 21, 2009, Turkmen individuals attacked Ilya while he was playing in a courtyard. Ilya suffered a head injury after being struck on the head with a stick. Pavlov reported the incident to the police, but the police refused to take action and classified the incident as an accident.

The final event occurred in August of 2010, when Pavlov and his brother were waiting in line at a motor vehicle inspection station. Both of them were casually dressed in the same manner as the Turkmen customers waiting in line. They were told that their car inspection documents could not be processed until they went home

4

and changed their clothes. Pavlov was told that "[y]ou Russians have to follow our rules now." (IJ at 43).

After these incidents, Pavlov decided that his family needed to leave Turkmenistan. Pavlov, Danil, and Ilya entered the United States on October 19, 2010 and were authorized to remain in the United States until April 18, 2011. On July 7, 2011, the Department of Homeland Security ("DHS") issued Pavlov and his sons a Notice to Appear, charging them with being removable as aliens who remained in the United States for a time longer than permitted.

DHS commenced removal proceedings against Pavlov and charged him with removability under § 237(a)(1)(B) of the Immigration and Nationality Act ("INA"). Pavlov conceded his removability, but he filed claims for asylum, withholding of removal, and protection under CAT, with Danil and Ilya as derivatives of his petitions. The IJ held merits hearings in February and May of 2012 to evaluate Pavlov's application. He issued a decision finding Pavlov removable and denying Pavlov's application for asylum, withholding of removal, and protection under CAT on September 20, 2012.

The IJ found Pavlov's testimony not credible—noting that Pavlov's testimony at the merits hearings was materially inconsistent with statements made in an affidavit he submitted with his application. Furthermore, the IJ found that Pavlov's testimony about Ilya's head injury was inconsistent with other evidence in the record. Alternatively, the IJ found that Pavlov's claims failed because he did not demonstrate past persecution or a well-founded fear of future persecution. Specifically, the IJ

5

found that while Russians face economic discrimination and are treated as second-class citizens, that treatment does not rise to the level of persecution. The IJ further explained that there was no evidence that the military hazing of ethnic Russians was more severe than that faced by individuals from any other ethnic, geographic, or tribal background. Accordingly, the IJ denied Pavlov's application for asylum, withholding of removal, and relief under CAT.

Following the IJ's decision, Pavlov petitioned the BIA for review. The BIA dismissed Pavlov's appeal, finding that the IJ's adverse credibility determination was proper and finding no other clear errors in the IJ's decision. This timely petition for review followed.

## II.    DISCUSSION[2]

### 1.    *Standard of Review*

When the BIA issues its own decision, this Court will review that decision and not the decision of the IJ. *Sheriff v. Att'y Gen.*, 587 F.3d 584, 588 (3d Cir. 2009). However, "[w]hen the BIA adopts or defers to the underlying decision of the IJ, we review the IJ's opinion as the decision of the agency." *Garcia v. Att'y Gen.*, 665 F.3d 496, 502 (3d Cir. 2011). Here, the BIA issued a decision that substantially relied on the IJ's decision, and it deferred to the IJ's findings on each issue. Accordingly, we review the IJ's decision as the decision of the agency. *Id.*

---

[2] The BIA had jurisdiction to review the IJ's decision pursuant to 8 C.F.R. § 1003.1(b)(3). This Court has jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252(a).

This Court reviews legal determinations *de novo*, subject to the principles of deference established in *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Kaplun v. Att'y Gen.*, 602 F.3d 260, 265 (3d Cir. 2010). We review adverse credibility determinations and other findings of fact under the substantial evidence standard. *Lin-Zheng v. Att'y Gen.*, 557 F.3d 147, 155 (3d Cir. 2009). Under this standard, factual findings are upheld so long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id*. (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). This court "cannot supersede an administrative agency's findings simply because an alternative finding could be supported by substantial evidence." *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 424–25 (3d Cir. 2005). However, this deference is not warranted when "any reasonable adjudicator would be compelled to conclude to the contrary." *Lin-Zheng*, 557 F.3d at 155 (citing 8 U.S.C. § 1252(b)(4)(B) (2012)).

### 2.     *Asylum Claim*

Pavlov first appeals the denial of his petition for asylum. The INA authorizes the Attorney General to grant asylum to any person who has established that he is a refugee. 8 U.S.C. § 1158(b)(1)(A) (2012). To establish refugee status, an applicant must show either past persecution or a well-founded fear of future persecution based on a protected characteristic. *Id*. at § 1101(a)(42)(A) (2012); 8 C.F.R. § 208.13(b) (2014). The applicant must also prove that his "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason" for persecution. 8 U.S.C. § 1158(b)(1)(B)(i) (2012).

7

### A. Adverse Credibility Determination

Pavlov first argues that the IJ erred by concluding that his testimony was not credible "based on minor omissions and inconsistencies between his affidavit and his testimony." (Appellant's Br. at 16). Pavlov further argues that minor inconsistencies or omissions that "do not go to the heart" of the asylum claim cannot support an adverse credibility determination. (*Id.* at 17). The burden is on the applicant to establish that he is a refugee. 8 U.S.C. § 1158(b)(1)(B)(i) (2012); 8 C.F.R. § 208.13(a) (2014). An applicant's testimony standing alone may satisfy this burden, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible." 8 U.S.C. § 1158(b)(1)(B)(ii) (2012).

Therefore, in evaluating whether an applicant has sustained his burden, the IJ must make a credibility determination. The REAL ID Act sets forth the standard for credibility determinations for asylum applications that were filed after May 11, 2005. 8 U.S.C. § 1158(b)(1)(B)(iii) (2012); *Chukwu v. Att'y Gen.*, 484 F.3d 185, 189 (3d Cir. 2007). Pursuant to the REAL ID Act, the IJ's credibility determination must be based on "totality of the circumstances, and all relevant factors," including:

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, *without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim*, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii) (2012) (emphasis added). Prior to the REAL ID Act, minor omissions or inconsistencies that did not go to the heart of the asylum claim could not support an adverse credibility determination. *See Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) ("Generally, minor inconsistencies and minor admissions that reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." (internal quotation marks and citations omitted)). However, the Real ID Act created a new standard that permits the trier of fact to base credibility determinations on a wide variety of factors, regardless of whether an inconsistency relates to the heart of the asylum claim.

Generally, the IJ's overall credibility determination "is more properly decided on the cumulative effect of the entirety of the [applicant's testimony]" rather than on each individual element. *Jishiashvili v. Att'y Gen.*, 402 F.3d 386, 396 (3d Cir. 2005). This Court generally defers to the IJ on credibility questions where the IJ's findings and conclusions are supported by the record. *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003). However, the IJ must give the applicant the opportunity to explain any inconsistencies in his testimony before making a credibility determination. *Caushi v. Att'y Gen.*, 436 F.3d 220, 226 (3d Cir. 2006).

The REAL ID Act provisions concerning testimonial credibility govern this analysis because Pavlov filed his asylum petition in 2012—well after the May 2005 date in which the REAL ID Act took effect. 8 U.S.C. § 1101 (2012). The REAL ID Act specifically authorized the IJ to base his credibility determination of Pavlov's testimony "without regard to whether the inconsistency . . . goes to the heart of the

applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii) (2012). Therefore, it was permissible for the IJ to base his credibility determination solely on issues that did not go to the heart of Pavlov's asylum claim. The REAL ID Act compels us to reject Pavlov's argument that the IJ erred by basing his adverse credibility determination on inconsistencies that allegedly do not go to the heart of Pavlov's asylum claim.

On appeal, Pavlov contends that the IJ erred in determining that Pavlov's testimony was not credible based on several inconsistencies between his testimony and the written documentation he submitted. (Appellant's Br. at 16–20). We disagree. Substantial evidence supports the IJ's adverse credibility determination. For example, Pavlov testified at his merits hearing that after the playground incident where his wife and son were chased away, he called the police and they did not respond. (IJ at 41). This information was not included in his affidavit dated April 12, 2011. Pavlov explained that he did not include this information in his affidavit because if he wrote down everything that happened to him, "it would not fit in the book." (*Id.*). On appeal, Pavlov contends that he did not include his call to the police because "[i]t was not shocking . . . that the police were disinterested in this incident." (Appellant's Br. at 18). Pavlov submitted a nearly seven-page, single spaced affidavit detailing events dating back to 1991. As the IJ noted, in this otherwise highly detailed and lengthy affidavit, this is the type of information that one expects to be included. (IJ at 55). Applying the substantial evidence standard, we do not reject the IJ's conclusion that this explanation was insufficient.

Pavlov also testified at the merits hearing that the police beat him on the back and shoulders when he was being interrogated about Elena's asylum application in the United States. (*Id.* at 42). Pavlov did not make any mention of being hit in his affidavit. When given the opportunity to explain this discrepancy, Pavlov explained he did not include the incident because he did not consider it to be a "formal beating" and he did not have corroborating medical evidence. (*Id.*) However, as the IJ noted, Pavlov's affidavit contains descriptions of several other instances that are not supported by corroborating evidence. (*Id.* at 56). Pavlov's affidavit contained a description of being beaten at the playground. (Appellant's R. at 66) He did not supply any evidence corroborating this incident. Therefore, substantial evidence supports the IJ's determination that the lack of documentation is an implausible excuse for Pavlov's failure to include the beating in his affidavit when he included other unsubstantiated events.

Finally, substantial evidence supports the IJ's adverse credibility determination based on the inconsistencies between Pavlov's testimony and documentary evidence regarding Ilya's head injury. Pavlov testified that Ilya sustained his head injury on August 21, 2009, when Pavlov was out of town. (IJ at 43). Pavlov stated that when he returned home two days later, on August 23, he saw Ilya with bandages on his head. (*Id.*). However, the evidence that Pavlov submitted in support of his petition, including medical documentation and an affidavit submitted by Elena's mother, Valentine Artuhina ("Artuhina"), indicated that Ilya's injury took place on August 15, 2009. (*Id.* at 56).

11

Artuhina's affidavit further stated that she took Danil and Ilya out of town for a week beginning on August 22, 2009. (*Id.*). Accordingly, Pavlov could not have seen Ilya's bandaged head on August 23, when Pavlov had returned to his hometown and Ilya was away with his grandmother. Artuhina's affidavit also stated that the police came to her home and spoke with her husband while she, Danil, and Ilya were out of town. (*Id.*). Pavlov testified that he was present when the police came to the home. (*Id.*). However, Artuhina's affidavit does not make any mention of Pavlov seeing Ilya's bandaged head days after the injury nor of him being present when the police came. (*Id.*). The material inconsistencies between Pavlov's testimony and his documentary evidence support the IJ's adverse credibility determination.

The IJ's credibility determination was based on the cumulative effect of these inconsistencies in Pavlov's testimony. *Jishiashvili*, 402 F.3d at 396. Because "reasonable, substantial, and probative evidence on the record" supports the IJ's adverse credibility findings, we affirm that decision. *Lin-Zheng*, 557 F.3d at 155.

### B. Well-Founded Fear of Future Persecution

Pavlov next argues that the BIA and IJ erred in finding that he does not have a well-founded fear of future persecution because he faces "life-threatening consequences" for returning to Turkmenistan after filing for asylum. (Appellant's Br. at 22–23). He also argues that his sons will be subject to Turkmenistan's pattern or practice of hazing ethnic Russians in the military. (*Id.* at 20–21).

An applicant can establish eligibility for asylum by demonstrating a well-founded fear of future persecution based on a protected characteristic. 8 U.S.C.

12

§ 1101(a)(42)(A) (2012); 8 C.F.R. § 208.13(b) (2014). To prove a well-founded fear of persecution, an applicant must meet a two-pronged test. *Lie v. Ashcroft*, 396 F.3d 530, 536 (3d Cir. 2005). First, the applicant must demonstrate a subjective fear of persecution "through credible testimony that [his] fear is genuine." *Id*. Second, the applicant must show that "a reasonable person in the alien's circumstances would fear persecution if returned to the country in question." *Id.*

In order to meet this second, objective prong, the applicant must (1) show that he would be individually singled out for persecution, or (2) demonstrate that his country of nationality has a pattern or practice of persecuting groups similarly situated to the applicant based on a protected characteristic. *Id*. (citing 8 C.F.R. § 208.13(b)(2)(iii)(A) (2014)). The INA does not define the country conditions that constitute a "pattern or practice of persecution." *Id.* at 537. However, as a threshold matter, this Court has held that the persecution of the group must be "systematic, pervasive, or organized" and sufficiently widespread to constitute a pattern or practice. *Id.*

Substantial evidence supports the IJ's determination that Pavlov failed to establish a pattern or practice that would lead to future persecution should he and his sons return to Turkmenistan.[3] The record established that military hazing in Turkmenistan is severe and is often based on ethnic, geographic, or tribal affiliation. (IJ at 45, 50). However, we agree with the IJ that Pavlov did not present sufficient

---

[3] The IJ found that Pavlov did not "allege that he will be singled out for persecution upon return to Turkmenistan" and instead treated Pavlov's claim as one based on a pattern or practice of persecution. (IJ at 58).

13

evidence to conclude that ethnic Russians are singled out for more severe hazing than individuals from other backgrounds. (*Id.* at 59). The affidavit Pavlov submitted from one ethnically Russian former conscript on his brutal hazing in the military is not sufficient to demonstrate that there is a "systematic, pervasive, or organized" pattern or practice of persecution of ethnic Russians in the Turkmen military. *Lie*, 396 F.3d at 537. Pavlov therefore failed to show he had an objective fear of future persecution based on the Turkmen's pattern or practice of discrimination.

Furthermore, Pavlov speculates that because of his experience being interrogated when his wife filed for asylum, he is also "likely" to face danger because of his asylum application. (Appellant's Br. at 23). However, he cannot cite to evidence in the record that Turkmen officials will inflict "life-threatening consequences" because of his asylum application, or even that they know of it. (*Id.*) Pavlov also asserts that because of the dwindling numbers of Russians in Turkmenistan, there is a strong likelihood that he will be persecuted by civilians and the police. (*Id.* at 24). Again, Pavlov does not cite to evidence in the record to support this assertion. Pavlov has therefore not presented substantial evidence that would compel us to overturn the IJ's determination that Pavlov failed to prove a well-founded fear of persecution.

### 3. *Withholding of Removal and CAT*

Pavlov also appeals the decision to deny his request for withholding of removal pursuant to INA § 241(b)(3) and relief under CAT. This Court has previously recognized that the threshold for granting asylum "is lower than [the one]

14

for protection under the withholding of removal or CAT provisions." *Yu v. Att'y Gen.*, 513 F.3d 346, 349 (3d Cir. 2008). Therefore, the "rejection of the petitioners' asylum claims necessarily requires that their CAT and withholding claims be rejected as well." *Id.* Because Pavlov has failed to meet his burden in establishing his asylum claim, he has also failed to meet the more demanding burdens necessary to establish his claims for withholding of removal and relief under CAT. We therefore deny Pavlov's petition for relief from the decisions for withholding of removal pursuant to INA § 241(b)(3) and relief under CAT.

## III. CONCLUSION

For the foregoing reasons, we will deny the petition for review.