# United States Court of Appeals
## For the First Circuit

No. 08-2336

SELVIN ASAEL MEJILLA-ROMERO,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Selya and Stahl, Circuit Judges.

Nancy J. Kelly, John Willshire-Carrera, and the Harvard Immigration Clinic at Greater Boston Legal Services were on brief for petitioner.
Tony West, Assistant Attorney General, Civil Division, James E. Grimes, Senior Litigation Counsel, Office of Immigration Litigation, and William C. Minick, Attorney, Office of Immigration Litigation, were on brief for respondent.

April 6, 2010

**LYNCH**, <u>**Chief Judge**</u>.  Selvin Asael Mejilla-Romero, then age eleven, entered the United States illegally and without inspection near Brownsville, Texas, on July 24, 2002.  He is now eighteen years old.  He petitions for review of a final order of the Board of Immigration Appeals (BIA) denying his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).

The BIA and the Immigration Judge (IJ) rejected the claims on a number of independently sufficient grounds.  They rejected his past persecution claims, which asserted that when he lived with his grandmother as a child in Honduras the mistreatment he suffered at the hands of two antagonists--a neighbor and a street gang--amounted to "persecution."  They found in addition that he had failed to show the mistreatment was "on account of" any of the five protected grounds and failed to show the requisite connection to government action or inaction existed.  Thus, he had not met the past-persecution prong.

The BIA and IJ also rejected Mejilla-Romero's assertions that he will suffer future persecution if returned to Honduras on account of his resistance to gang membership, an ongoing feud with his grandmother's neighbor's family, and the possibility that he may be homeless, although he has some family there.  They also both found that he had failed to establish eligibility for withholding of removal or relief under the CAT.  Both the BIA and IJ considered

-2-

all the evidence of record, as have we, and we cannot say the record compels us to reach different conclusions as to the legal requirements for asylum, withholding of removal, and CAT relief. We deny Mejilla-Romero's petition.

## I.

As a child, Mejilla-Romero lived with his grandmother in the small Honduran town of Arimis. While Mejilla-Romero was growing up, he had a series of bad encounters with a neighbor named "Hubert." Hubert called Mejilla-Romero's family "[c]ommunists" and said, as an attack on the family, that they were "[p]eople that are dying, that are starving." Hubert also threw stones at Mejilla-Romero and once threw a machete that hit petitioner's leg, leaving a visible scar. On another occasion, Hubert attacked Mejilla-Romero's grandmother's home with a machete, and he once destroyed the garden. Mejilla-Romero claims the shock from the attack on the garden sent his ailing aunt to the hospital, where she ultimately died.

Mejilla-Romero also had great difficulties with a gang of young males, aged fifteen and older, who came to Arimis from another town. On several occasions, the gang waited for Mejilla-Romero outside of school and attempted to steal his money. The gang members pushed him and once threw him from a small house, leaving him entangled in wire. He was disentangled by a man he called his "uncle," who may not have been a blood relative. In a

July 2005 affidavit, Mejilla-Romero stated that these "older boys" also threw snakes at him several times and that he "feared that they wanted to sexually target" him; he offered no further details and did not describe these incidents in his testimony before the IJ. Mejilla-Romero believes that all of these incidents were motivated by the gang members' wanting to recruit him into their gang. Mejilla-Romero concedes that neither he nor his family ever contacted the police or other authorities about any of these incidents.

Additionally, one of Mejilla-Romero's uncles was killed in 1996, when Mejilla-Romero was five years old. A Honduran court issued an arrest warrant shortly after his death, stating that his killer had been indicted "for the crime of assassination" and calling for his arrest "as expeditiously as possible." A copy of this warrant was in evidence before the IJ. Although Mejilla-Romero does not recall the circumstances of his murder, no evidence compelled the conclusion that there was any connection between petitioner's mistreatment and his uncle's death.

Mejilla-Romero is now eighteen years old, having spent the seven years since his illegal entry in the Boston area with his mother. While in this country, Mejilla-Romero and his family have also been victims of traumatizing violence, discussed both in his own testimony and in statements he made to a psychologist whom he

saw in support of his asylum application. That report was in evidence and was referred to by the IJ in his decision.

While in the United States, Mejilla-Romero also met again with his father, who later returned to Honduras. Though his father, grandmother, and members of his grandmother's family currently reside in Honduras, he fears that he will be homeless if he returns.

Federal authorities served Mejilla-Romero with Notice to Appear the day after he entered this country. There were proceedings and hearings spread out over a number of years as Mejilla-Romero made efforts to achieve legal status. In October 2004, after it had been determined that he was ineligible for Temporary Protected Status, Mejilla-Romero filed an application for asylum, withholding of removal, and CAT relief.

In hearings before an IJ between July 2005 and November 2006, Mejilla-Romero testified in support of his application for relief. He was then between thirteen and fourteen years old. The IJ also reviewed documentary evidence and heard testimony from Mejilla-Romero's mother and maternal aunt. The mother was not in Honduras at the time of the incidents with petitioner and had no firsthand knowledge of the encounters. The aunt had left Honduras in 1998. She did not appear for scheduled cross-examination on what was to have been her second day of testimony; the IJ took her

absence into account.  The IJ considered the testimony of both the mother and the aunt, as his opinion shows.

At the close of proceedings in November 2006, the IJ observed that "given the amount of material and evidence" it "ma[de] sense to do a written decision."  In a twenty-page written decision on March 5, 2007, the IJ allowed Mejilla-Romero to file his asylum application late[1] and rejected the application for relief.

The IJ deemed Mejilla-Romero's own testimony credible and found that he had a subjective fear of returning to Honduras.  The IJ found, however, that Mejilla-Romero had not established either past persecution or that his mistreatment was based on one of the statutory grounds.  As a result, no presumption of future persecution arose.  The IJ further found that Mejilla-Romero had not carried his burden of showing an objectively reasonable fear of future persecution on any of the statutory grounds.

The IJ comprehensively reviewed the testimony of Mejilla-Romero's mother, devoting more than four pages of the decision to thoroughly reciting her account.  Mejilla-Romero's mother had left

---

[1]     The IJ found that "extraordinary circumstances" justified Mejilla-Romero's failure to timely file his asylum application within one year of entry to the United States.  See 8 C.F.R. § 1208.4(a)(5).  In particular, the IJ ruled that, in light of Mejilla-Romero's young age upon arriving in the United States, compliance with subsequent filing deadlines, and submission of "voluminous documentation" in support of his asylum application, his application would not be time-barred.

Honduras for the United States in 1994, fearing that her violent, sexually abusive boyfriend would kill her if she remained in that country. No evidence connected that boyfriend--who was not Mejilla-Romero's father--with the encounters Mejilla-Romero had. The mother applied for asylum, but her application was denied. As of March 2007, she had Temporary Protected Status.

Among the testimony addressed by the IJ was the mother's description of her family's history of "being 'persecuted' on the basis of their involvement in ongoing property disputes." The IJ's decision noted several incidents of serious violence against the family described by the mother, including the killing of her step-father by a hired "soldier" and the murder of her brother by a relative of Hubert's, which occurred after she had left Honduras. It also cited her testimony that she would not consider living elsewhere in Honduras in part "because she is uncertain as to where she would reside."

The IJ's decision detailed specific inconsistencies in the mother's testimony. For instance, the IJ noted that the mother had initially said that Mejilla-Romero's grandmother had told her in a telephone conversation that Mejilla-Romero was at risk from Hubert and the gangs, but later testified that she only learned the reasons why Mejilla-Romero left Honduras when Mejilla-Romero described them to her upon his arrival in this country. The IJ further observed that the mother "initially testified that she

belonged to [an organization called] 'Lincol,' but later testified that 'Lincol' was an organization of wealthy individuals who did not want 'poor people' such as [Mejilla-Romero's grandmother] to reside on their land."

The IJ also summarized the aunt's testimony, which described her family being "targeted" over a land dispute and referenced the murder of her brother by a neighbor, as a consequence of such disputes. The IJ noted inconsistencies in the aunt's testimony, observing that she had stated that her family was a member of "Lincol" but also that the group had targeted her family and that the man who murdered her brother had been a member of the organization. The aunt never applied for asylum but received Temporary Protected Status in 1999.

The IJ found that Mejilla-Romero's mother's testimony was "often unclear" and marred by "numerous inconsistencies as compared to her [own] Application for Asylum," but that it still "generally corroborated" Mejilla-Romero's narrative. The IJ did not otherwise make explicit credibility findings regarding the mother's or aunt's testimony.

The IJ explicitly took into account Mejilla-Romero's "age at the time these events occurred," and noted that "[b]ehaviors that an adult may not typically associate with persecution or serious harm may produce lasting damage or physical and psychological trauma in a child and thus constitute persecution."

The IJ did not reject any of Mejilla-Romero's testimony on the basis of it having been overly basic or simplistic.

Even allowing for Mejilla-Romero's credibility and the special consideration as to children, the IJ found that Mejilla-Romero's bad experiences in Honduras, while "without a doubt, troubling," did not rise to the level of "persecution." The IJ cited our holdings that "to qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering, Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2004), and consist of systemic mistreatment rather than a series of isolated events. Bocova v. Gonzales, 412 F.3d 257, 263 (1st Cir. 2005)." Against this backdrop, the IJ held that the encounters described "amount[ed] to no more than a series of isolated altercations with a disgruntled neighbor and . . . a group of boys who bullied younger children." The IJ explicitly considered the psychologist's report[2] but concluded that the trauma Mejilla-Romero

---

[2] The report was based on an assessment conducted in June 2005, shortly before Mejilla-Romero's testimony before the IJ, in support of his application for asylum. A staff psychologist in the Cambridge Health Alliance's Latino Mental Health Program evaluated Mejilla-Romero as presenting "significant symptoms of anxiety," noting that he had nightmares about running from those who want to harm him and that he struggled with intrusive memories of past traumatic events. He was preoccupied about his grandmother, whom he had not, at that point, heard from since 2002. The report said "[t]here is no evidence of psychotic symptoms," "[h]e is alert and oriented," and that he had "good impulse control," as well as "very good insight into his problems." In addition to the experiences with Hubert and the gang, the report also noted an incident in Honduras in which Mejilla-Romero said he had a live snake thrown at him and other occasions on which he claimed to have fended off possible sexual assaults. The report did not specify who had

had experienced was not shown to be connected to Hubert or the gang, particularly given the trauma Mejilla-Romero suffered as a young child traveling unaccompanied to the United States. He found insufficient evidence of causation from the experiences in Honduras as to rise to the level of past persecution.

The IJ further found, as an independent ground, that there was no evidence that Mejilla-Romero "was ever physically <u>punished for possessing a belief or characteristic</u> that others sought to overcome." (emphasis added).

The IJ also determined that Mejilla-Romero had failed to establish an objectively reasonable fear that he would suffer future persecution in Honduras. Mejilla-Romero testified he feared he would be living on the streets and would be killed by the "boys" and "the neighbors." However, as the IJ observed, he also testified that his grandmother was living with "various relatives"

---

thrown the snake or attempted to sexually assault him.

The report also discussed incidents involving Mejilla-Romero's family two weeks earlier in their housing project in Boston, observing that Mejilla-Romero, his mother, and other siblings had been threatened, and that the family was "terrified" of violence in this country. The recent rounds of violence included his mother's partner being attacked with a bat and having his arm broken, the family car being vandalized, and men banging on their apartment door with a bat. The family was moved to a different location.

The psychologist concluded that Mejilla-Romero presented "a constellation of symptoms indicative of . . . Post Traumatic Stress Disorder (PTSD)." The report did not attempt to attribute the PTSD to specific events. It concluded that Mejilla-Romero was affected by ongoing post-traumatic symptoms resulting from the "traumatic experiences he was exposed to in his first eleven years of life in Honduras" and that the "extremely violent events" of the past two weeks had led to "an exacerbation of his symptoms."

in Honduras and that his father had returned to that country as well. The IJ noted that Mejilla-Romero had offered no testimony "as to whether his father and grandmother . . . have encountered any difficulties with 'Hubert' or with . . . gangs who may still wish to recruit" Mejilla-Romero. Accordingly, the IJ found that Mejilla-Romero's own "testimony--combined with his failure to be forthcoming about the whereabouts of his father--greatly undercut[] whether [he] objectively fear[ed] 'living on the streets' or future persecution at the hands of 'Hubert' and the . . . gangs."

The IJ independently found it likely Mejilla-Romero "could either reside with his father or grandmother or relocate" to another area and successfully avoid Hubert and the gangs. The IJ cited to several reports in the record that reflected Honduras's "pervasive gang problem" and other social issues. However, the IJ also noted specific State Department and Amnesty International reports, submitted by petitioner, which reflected the Honduran government's commitment to "children's rights and welfare" and emphasized the Honduran government's progress in investigating crimes victimizing children. Since Hubert's family lived in Arimis, and a State Department report indicated that Honduran gang membership "is primarily confined to [two] large urban centers," the IJ found that Mejilla-Romero could mitigate the risks he faced by "safely relocat[ing]" elsewhere in Honduras. The IJ rejected

the future persecution claim and the claim that it was likely petitioner would be subject to torture.

In addition, the IJ determined that Mejilla-Romero's failure to carry the "lesser burden" of proving his asylum claim meant he had failed to meet the more exacting requirements for withholding of removal. The IJ also concluded that although there could be a risk that Mejilla-Romero would encounter violence in Honduras, this threat was not sufficiently extreme to qualify him for CAT relief.

The BIA rejected Mejilla-Romero's appeal in a two-page opinion issued on September 25, 2008. The BIA agreed with the IJ's determination that Mejilla-Romero had "failed to meet his burden of establishing past persecution, or that he would be persecuted if returned to Honduras on account of one of the statutorily protected grounds, or tortured in the future." It also cited two additional BIA decisions that "squarely address[ed]--and preclude[d]" the claim that Mejilla-Romero had been persecuted on the basis of his membership in a social group that consisted of young men who had resisted gang recruitment.

The BIA affirmed the IJ's conclusion that the actions of Mejilla-Romero's "disgruntled neighbor and a gang of youths did not rise to the level of persecution." As a separate basis for its decision, it emphasized that Mejilla-Romero also had not shown his alleged persecution involved "some connection to government action

-12-

or inaction, related to a protected ground for asylum," as required by our caselaw. The BIA also agreed with the IJ's holding that Mejilla-Romero's failure to satisfy the requirements for asylum necessarily meant he had failed to meet the more stringent standard for withholding of removal, and it affirmed that his failure to present "evidence establishing that it is more likely than not that he would be subject to torture upon return to Honduras" rendered him ineligible for CAT relief.

This petition for review followed.

## II.

We review both the single-member BIA decision and the IJ's decision. See 8 C.F.R. § 1003.1(e)(5); Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 20 (1st Cir. 2004). We do not engage in de novo review of the record but instead evaluate Mejilla-Romero's challenges to the IJ's and BIA's findings of fact under the "highly deferential" substantial evidence standard. Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005). We must accept the IJ and BIA findings "so long as they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Id. (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). Under this standard, we will deny the petition for review unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Scatambuli v. Holder, 558 F.3d 53, 58 (1st Cir. 2009). We review rulings of law

-13-

de novo but "give substantial deference to the BIA's interpretations of the underlying statutes and regulations according to administrative law principles." Scatambuli, 558 F.3d at 58.

To qualify for asylum, an applicant must establish that he "suffered past persecution or has a well-founded fear of future persecution" on the basis of "'race, religion, nationality, membership in a particular social group, or political opinion.'" Id. (quoting 8 U.S.C. § 1101(a)(42)(A)); see also Dias Gomes v. Holder, 566 F.3d 232, 233 (1st Cir. 2009).

A finding of past persecution gives rise to the presumption of a well-founded fear of future persecution. Orelien v. Gonzales, 467 F.3d 67, 71 (1st Cir. 2006). When that presumption arises, the burden shifts to the government to show that changed circumstances have eliminated the petitioner's fear of persecution or that he may practicably avoid future persecution by relocating to another part of his country. Id.; see also 8 C.F.R. § 1208.13(b)(1)(i).

Absent any showing of past persecution, an applicant may "prevail on an asylum claim by proving . . . a well-founded fear of future persecution independent of any presumption." Orelien, 467 F.3d at 71. To do so, he must demonstrate that his fear is both subjectively genuine and objectively reasonable. Id.

The term "persecution" has not been statutorily defined. Our precedents hold that a finding of past persecution "requires that the totality of a petitioner's experiences add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment," Nikijuluw, 427 F.3d at 120, a "threshold [that] is not easily crossed," Orelien, 467 F.3d at 71. In addition, there is a separate requirement that an applicant qualifies for asylum "only when he suffers persecution that is the direct result of government action, government-supported action, or government's unwillingness or inability to control private conduct." Nikijuluw, 427 F.3d at 121; see also Dias Gomes, 566 F.3d at 233; Raza v. Gonzales, 484 F.3d 125, 129 (1st Cir. 2007); Orelien, 467 F.3d at 72; Galicia v. Ashcroft, 396 F.3d 446, 448 (1st Cir. 2005). Applying these principles, we are required to deny Mejilla-Romero's petition.

First, the IJ's and BIA's determinations that Mejilla-Romero's experiences did not rise to the level of persecution were supported by substantial evidence. Both the IJ and the BIA considered Mejilla-Romero's encounters with his neighbor and the gang, which are the source of his claims of persecution. Both determined that these isolated altercations, while unfortunate, were not sufficiently severe to meet the high bar required for a

finding of past persecution.  Our caselaw upholding BIA findings about what constitutes persecution supports that conclusion.[3]

While one can have sympathy for petitioner, that is not a basis on which to find the IJ and BIA were compelled to find other than they did.  Bocova, 412 F.3d at 263.  The IJ also found the psychological-effects evidence had not been shown to be causally connected to the mistreatment of Mejilla-Romero in Honduras, as opposed to other causes, and was insufficient to establish persecution.

The IJ's and BIA's supportable determination that Mejilla-Romero did not suffer from persecution is sufficient by itself to deny the petition, without reaching the question of whether the actions against him were motivated on account of one of

---

[3] See Ravix v. Mukasey, 552 F.3d 42, 44-46 (1st Cir. 2009) (holding that incidents including being "struck in the head by a stone" and threatened at gunpoint did not rise to the level of past persecution); Santosa v. Mukasey, 528 F.3d 88, 92-93 (1st Cir. 2008) (holding that a series of incidents in which the Indonesian petitioner was targeted for his Chinese ethnicity, including being bullied as a child and adolescent, attacked by a group of ten people as a teenager, having rocks thrown at his store, and having his car destroyed, did not rise to the level of past persecution); Susanto v. Gonzales, 439 F.3d 57, 59-60 (1st Cir. 2006) (holding that "ugly, discriminatory, and regrettable" incidents, including "vandalization of the family home," a failed sexual assault when the petitioner was fourteen years old, a mugging at knifepoint, the bombing of the petitioner's church, and episodes in which crowds "threatened and threw stones at [the petitioner] and her fellow worshipers" did not rise to the level of past persecution); Bocova, 412 F.3d at 263 (holding that two incidents in which the petitioner was arrested, beaten, and threatened with death did not rise to the level of past persecution).

-16-

the five statutorily protected grounds.  See, e.g., Khan v. Mukasey, 549 F.3d 573, 576-77 (1st Cir. 2008).

Mejilla-Romero asserts that the IJ and BIA erred in concluding that he had not met his burden to prove the "on account of" prong.  He argues that the BIA mischaracterized the nature of the attacks against him and his family, overlooking a purportedly decades-old political dispute between the family and its neighbors, as well as the types of violent gangs that operate in Honduras.  The IJ and BIA did reject the claim that the treatment Mejilla-Romero received in Honduras had a political motivation and that was also supported by substantial evidence.  This, too, provides an independent ground on which we must deny the petition.

The evidence does not establish, much less compel, the conclusion that Mejilla-Romero has drawn the necessary connection to one of the five grounds.  Mejilla-Romero's testimony contained no clear explanation for the motivation for Hubert's behavior and certainly did not link it to any political feud between Hubert's family and his own.  Hubert lived with his aunt, who owned the neighboring property.  Mejilla-Romero testified only that he had heard Hubert call his family "[c]ommunists" and describe them as "[p]eople that are dying, that are starving."[4]  Nothing compelled

_____

[4]    In Mejilla-Romero's October 2004 affidavit in support of his application for asylum, he stated that he recalled that many of his grandmother's neighbors were "upset" because his family had less money than the neighbors and his grandmother built her home on a "used piece of land in the neighborhood."  He also said that his

-17-

the IJ or the BIA to conclude that these statements signaled that Hubert's motivations were based on the political beliefs of petitioner or his family, or on retaliation.

Nothing in the testimony of the mother or aunt, or other evidence, compels a different conclusion. The IJ did not make a credibility determination regarding Mejilla-Romero's mother's and aunt's statements beyond noting the flaws in his mother's testimony and observing that her account nonetheless "generally corroborated" Mejilla-Romero's testimony. However, the IJ thoroughly detailed both the mother's and the aunt's testimony, including statements that ostensibly linked Mejilla-Romero's encounters with Hubert to a broader history of politically motivated conflict between their families. Although the IJ plainly considered this testimony, the IJ's decision reflected its determination that neither Hubert's nor the gang's actions linked Mejilla-Romero's experiences to a political feud.

Neither Mejilla-Romero's mother's "unclear" and "inconsisten[t]" account, nor his aunt's incomplete and sometimes-inconsistent testimony compel the conclusion that Hubert's acts

family's differences from the neighbors "became even clearer" when he realized that his family flew the Liberal Party's red flag and the neighbors flew the National Party's blue flags. These affidavit statements do not compel the conclusion that his encounters with Hubert were based on the political beliefs of Mejilla-Romero or his family. Moreover, he did not mention these events in his subsequent testimony before the IJ and indeed testified he did not know why Hubert threw stones at him or did not like his grandmother.

-18-

were part of a larger pattern of attacks on account of the political opinions of petitioner's family. Both the IJ and BIA implicitly rejected those portions of Mejilla-Romero's mother's and aunt's narratives that indicated Hubert's actions toward petitioner were part of a broader dispute concerning the political beliefs of petitioner or his family.[5]

Similarly, the IJ's and BIA's conclusion that the particular gang Mejilla-Romero encountered consisted of teenaged gang members whose motivation was to steal his money--not to recruit him--was amply supported by Mejilla-Romero's own testimony. That conclusion alone breaks any connection to an argument positing that the cause of petitioner's experience with the gang is that he belonged to a particular social group, a protected ground.

Even if Mejilla-Romero had shown the attacks were motivated by his resistance to gangs and gang recruitment, which he did not do, that would not help his case. Mere refusal to join a

---

[5] The assertion of a broader political dispute depends on stringing together bits and pieces of the sometimes-confusing and internally contradictory testimony of petitioner's mother and the incomplete testimony of his aunt. And to the extent Mejilla-Romero now argues that, in the absence of an explicit lack-of-credibility finding, we must take the mother's and aunt's testimony regarding the purported political feud as credible, his argument is flatly contradicted by our caselaw. See Kho v. Keisler, 505 F.3d 50, 56 (1st Cir. 2007) ("We have . . . rejected the proposition that aliens are entitled to a presumption of credibility on review in this court if there is no express credibility determination made by an IJ."); Zeru v. Gonzales, 503 F.3d 59, 73 (1st Cir. 2007) ("Nor is there an assumption that if the IJ has not made an express finding of non-credibility, the alien's testimony must be taken as credible.").

gang does not constitute political opinion.  Matter of E-A-G-, 24 I. & N. Dec. 591, 596 (BIA 2008).  In seeking judicial review, Mejilla-Romero argues the BIA was required to find he was a member of a particular social group because of his purported resistance to recruitment and antigang political opinions.  As the BIA held, any claim that Mejilla-Romero was specifically targeted on the basis of his membership in a protected "social group" comprised of individuals who resisted joining gangs is squarely precluded by BIA precedent on the definition of "social group."  The BIA correctly cited to its precedent.  See Matter of E-A-G-, 24 I. & N. Dec. at 594-95 (declining to find "persons resistant to gang membership" a social group for purposes of a Honduran asylum petitioner's persecution determination); Matter of S-E-G-, 24 I. & N. Dec. 579, 583-88 (BIA 2008) (holding that a proposed social group "consist[ing] of young Salvadorans who have been subject to recruitment efforts by criminal gangs, but who have refused to join . . . fail[ed] the 'social visibility' test and d[id] not qualify as a particular social group").

Mejilla-Romero argues that this analysis was insufficient as a matter of law to permit judicial review and that, in any event, the BIA's definition of social group is based on legal error.  The first argument is utterly without merit, as we detail below.  As to the second argument, he asserts that these BIA decisions erred in using a "social visibility analysis" and

-20-

"abandoned, without explanation" the method of social group analysis first articulated in Matter of Acosta, 19 I. & N. Dec. 211 (BIA 1985). That argument, too, is without merit. The decisions on which the BIA relied explained the reason for the BIA's actions. They are built on a body of BIA precedent that integrated consideration of "particularity" and "social visibility" into social group determinations, as a means of "giv[ing] greater specificity to the definition of a social group, which was first determined in [Acosta]." Matter of S-E-G-, 24 I. & N. Dec. at 582 (collecting cases). And the argument ignores First Circuit law, which is expressly to the contrary. We have explicitly affirmed the relevance of the social visibility inquiry to social group analysis. Faye v. Holder, 580 F.3d 37, 41 (1st Cir. 2009); Scatambuli, 558 F.3d at 59-60. There was no legal error in the BIA's analysis.

Petitioner's claim fails, as well, for another reason. As the BIA found, Mejilla-Romero did not show that the Honduran government was in any way involved in either the incidents with his neighbor or his encounters with the street gang, the bases for his purported "persecution." Nor did he present any evidence[6] that the

_____

[6] His opening brief is devoid of any citation to the record on this point. See Rios-Jimenez v. Principi, 520 F.3d 31, 39 n.5 (1st Cir. 2008) ("[A]ppellant's argument must contain '[the] appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.'") (quoting Fed. R. App. P. 28(a)(9)(A)) (second alteration in original).

Honduran government was unwilling to prosecute his assailants. In fact, he testified that, to his knowledge, no effort had been made to contact the authorities about the mistreatment he received, and there was no evidence that the authorities were aware of the attacks. Failure to inform law enforcement of threats or attacks a petitioner claims to have suffered is material to the rejection of claims of government participation or complicity in past persecution. See, e.g., Dias Gomes, 566 F.3d at 233 (holding the petitioners' failure to inform Brazilian police of gang threats "sever[ed] the threats from any action or inaction of the government of Brazil"); Castillo-Diaz v. Holder, 562 F.3d 23, 27-28 (1st Cir. 2009) (upholding IJ's determination that petitioner's failure to report a rape that occurred when she was fifteen years old precluded her claim of government involvement in the attack, while noting IJ's consideration of evidence "that the government of El Salvador has the power to prosecute rape cases and attaches a significant penalty to a conviction for rape"); Galicia, 396 F.3d at 448 (finding the petitioner's failure to contact authorities after beating was a basis for holding that petitioner "did not show that the harassment he suffered was by the government or a group the government could not control").

Mejilla-Romero urges that the failure to contact authorities should not bar his claim of past persecution; he claims to fall into an exception. He argues that efforts to involve

authorities are unnecessary when it is clear from the record that they "would have been unable or unwilling" to help. See In re S-A-, 22 I. & N. Dec. 1328, 1335 (BIA 2000). The argument again misses the mark. The BIA supportably found that what Mejilla-Romero suffered did not amount to persecution and further that he did not establish the government was unable or unwilling to help him.

The IJ recognized there had been "severe critici[sm]" of the Honduran government's antigang measures. But the IJ also cited specific reports in the record, which indicated that the Honduran government was committed to combating gang violence and promoting child welfare, as well as Mejilla-Romero's testimony that he did not know if the incidents with Hubert had been reported to the police and that no one had contacted the authorities regarding his experiences with the gang. Moreover, although the IJ did not discuss this point, record evidence showed that Honduran authorities had previously intervened on the family's behalf, indicting Mejilla-Romero's uncle's killer and issuing a warrant for his arrest.[7] Mejilla-Romero's emphasis on flaws in Honduras's criminal justice system does not alter the fact that the IJ's determination was supported by substantial evidence.

The IJ's and BIA's findings that Mejilla-Romero lacked a well-founded fear of future persecution were also supported by

_____

[7] The IJ's decision included a copy of the warrant in its recitation of the documentary evidence.

-23-

substantial evidence.  As the IJ held, the fact that Mejilla-Romero's father, his grandmother, and members of his grandmother's family reside in Honduras undercuts the objective reasonableness of Mejilla-Romero's fear that he would suffer persecution as a "street child"[8] or "at the hands of 'Hubert' and the . . . gangs." Mejilla-Romero did not testify as to whether any of his relatives who remained in Honduras faced ongoing difficulties with Hubert or the gangs.  The fact that a petitioner's family members "continue to live in relative safety" in his country of origin is relevant to an IJ's finding of failure to establish a well-founded fear of persecution.  Budiono v. Mukasey, 548 F.3d 44, 50 (1st Cir. 2008); see also Aguilar-Solis v. INS, 168 F.3d 565, 573 (1st Cir. 1999) ("Without some explanation, the fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits his return.").

In addition, the IJ found Mejilla-Romero could relocate safely elsewhere to avoid gang violence.  Mejilla-Romero's argument that the government failed to produce evidence that he could safely

_____

[8]    There is no need to analyze whether eighteen-year-olds are "street children" or whether "street children" suffer persecution in Honduras.  Cf. Escobar v. Gonzales, 417 F.3d 363, 368 (3d Cir. 2005) (rejecting an argument by younger petitioner that homeless Honduran children constituted a "particular social group" for purposes of asylum determination and explaining that "[p]overty, homelessness and youth are far too vague and all encompassing to be characteristics that set the perimeters for a protected group within the scope of the Immigration and Naturalization Act").

relocate elsewhere within Honduras misplaces the burden of proof. Having failed to show that he suffered past persecution, it was Mejilla-Romero's burden to demonstrate that he could not avoid future persecution by moving to another part of Honduras. See Orelien, 467 F.3d at 71. Substantial evidence supported the IJ's and BIA's determinations that he had not done so, since internal relocation could avoid both Honduran street gangs, which are "primarily confined" to particular urban areas, and "difficulties with 'Hubert,'" which "all occurred in and around Arimis."[9]

An argument is made that the IJ failed to consider the evidence in the record beyond Mejilla-Romero's own testimony. However, the IJ's lengthy written decision proves otherwise. The IJ thoroughly reviewed the testimony of Mejilla-Romero, his mother, and his aunt. The decision listed the extensive documentary evidence in the record and noted that the IJ had "considered all of

---

[9] Mejilla-Romero also argues that the BIA abused its discretion by failing to grant him humanitarian asylum, "a discretionary doctrine sometimes available even in the absence of a threat of future persecution." Bollanos v. Gonzales, 461 F.3d 82, 86 (1st Cir. 2006); see also 8 C.F.R. § 1208.13(b)(1)(iii). However, such relief explicitly requires a threshold showing of past persecution. 8 C.F.R. § 1208.13(b)(1)(iii); see also Waweru v. Gonzales, 437 F.3d 199, 205 (1st Cir. 2006) (noting that humanitarian asylum "is granted only in cases of extraordinary suffering") (internal quotation marks omitted).
Because we have found that substantial evidence supports the IJ's and BIA's determination that Mejilla-Romero's mistreatment did not constitute persecution, his "claim for discretionary relief necessarily also fails." Akinfolarin v. Gonzales, 423 F.3d 39, 44 n.6 (1st Cir. 2005).

the testimony and all of the documentary evidence in support of [Mejilla-Romero's] requests for relief from removal."

The IJ's attention to the documentary evidence was apparent in his analysis of Mejilla-Romero's claim. The decision explicitly cited, engaged with, and relied on a wide range of exhibits, including: Mejilla-Romero's application for asylum, his mother's application for asylum, his birth certificate, copies of his aunt's and uncle's death certificates, documents pertaining to the deportation of his father, a photograph of the scar on Mejilla-Romero's leg, affidavits on conditions in Honduras, numerous country reports, and the psychological evaluation. This far-reaching consideration by the IJ of the record is sufficiently clear to facilitate our review of the decision and demonstrates to the court that the IJ's ruling had a supportable basis in the record as a whole. See Pan v. Gonzales, 489 F.3d 80, 87 (1st Cir. 2007) ("Although an IJ may not simply ignore substantial testimonial and documentary proof, she need not discuss ad nauseam every piece of evidence. So long as the IJ has given reasoned consideration to the evidence as a whole, made supportable findings, and adequately explained her reasoning, no more is exigible.") (internal citation omitted).

Mejilla-Romero's related assertion that the BIA failed fully to articulate the basis for its decision is also without merit. Mejilla-Romero presented essentially the same arguments to

the BIA regarding the nature of the threats he faced from his neighbor and the street gang that he now makes to us. The BIA "is not required to dissect in minute detail every contention that a complaining party advances" and need only frame "its decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion." Raza, 484 F.3d at 128; see also Lopez Perez v. Holder, 587 F.3d 456, 460-61 (1st Cir. 2009). The BIA's adoption of the IJ's opinion and elaboration of certain points more than provided an adequate basis for review.

Because Mejilla-Romero cannot meet the less stringent standard for asylum, his arguments in support of his application for withholding of removal necessarily fail. See, e.g., Orelien, 467 F.3d at 73. So too is the record devoid of anything that would compel a fact-finder's determination that Mejilla-Romero would "more likely than not . . . be tortured if removed" to Honduras. 8 C.F.R. § 208.16(c)(2).

We are bound by strict standards of review. We may not grant the petition unless the evidence compels a conclusion different from that reached by the IJ. We are forbidden from engaging in de novo review or acting as though we were the IJ hearing the case.

The petition for review is denied.

**-Concurring Opinion and Dissenting Opinion Follow-**

-27-

**SELYA**, <u>Circuit Judge</u>, **concurring**.  This is a hard case. The record is plenitudinous and, by giving more weight to certain facts and less weight to gaps in the evidence, and drawing inferences accordingly, it is easy to paint a heart-wrenching picture of the petitioner's plight.  The dissenting opinion does a masterful job of painting just such a picture.

But there is a rub: reviewing courts, in immigration cases, do not have the luxury of choosing at will which facts to emphasize or which inferences to draw.  These are functions for the agency, and the appropriate standard of review requires a high degree of deference to the agency's choices.

In this case, the agency addressed the theories fairly raised, made permissible (albeit not inevitable) decisions about which facts controlled, drew reasonable inferences from those facts, and applied well-settled burdens of proof.  Sitting as a trier of fact, I might not have found the same facts controlling and might have reached the conclusion that my dissenting brother proposes. Yet, that is irrelevant to the task at hand.  The agency saw the matter differently: it emphasized the facts that it found controlling; squarely addressed and squarely rejected the petitioner's arguments; and made a judgment which, however unsympathetic, fell within the universe of supportable outcomes. In other words, the agency did its job.  The lead opinion recognizes

this reality and, to my mind, is faithful to the dictates of the standard of review.

In the last analysis, "it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law." Lopez de Hincapie v. Gonzales, 494 F.3d 213, 221 (1st Cir. 2007) (quoting Lord Campbell in East India Co. v. Paul, 7 Moo. P. C. C. 111).  Guided by that wise counsel, I join the lead opinion authored by Chief Judge Lynch and concur in the judgment of the court denying the petition for review.

**-Dissenting Opinion Follows-**

**STAHL**, <u>Circuit Judge</u>, **dissenting**. I dissent because the majority has repeated the same mistakes of the Board of Immigration Appeals (BIA) and the Immigration Judge (IJ) by failing to consider the complete record and misstating the relevant facts of this case.

The majority commits two related errors. First, the majority overlooks that the IJ and BIA denied Celvyn's[10] asylum application without considering the actual claim he put forth. Both courts characterized Celvyn's claim as alleging past persecution based merely on a dispute among neighbors over property boundaries. This error resulted because both administrative courts limited their understanding of the factual basis of Celvyn's claim to the oral testimony Celvyn gave when he was just thirteen years of age, testifying about events that occurred when he was a young child of five to eleven years old. In fact, the extensive supporting evidence submitted in this case supports Celvyn's claim that he suffered violent persecution on account of an imputed political opinion attributed to him because of his family's long-standing land activism. Where administrative courts render a decision that does not address the basis of an asylum applicant's claim, as they did here, we are required at a minimum to remand for consideration of the actual claim put forth by the applicant. We cannot, as the

_____

[10]Though the majority, the BIA, and the IJ refer to petitioner as Selvin Mejilla-Romero, the petitioner's name is Celvyn Azael Mejia Romero. Apparently the incorrect name originated with a data entry error in his original Notice to Appear and was never corrected by the government despite notice of the problem.

majority does here, simply review the facts in the first instance and affirm based on a rationale not considered by the agency.

Second, even if the majority is correct that it can remedy the lower courts' failure to consider the substance of Celvyn's claim by conducting a review of the facts in the first instance on appeal, the majority's attempt to review the record is ineffective. While the majority makes reference to some of Celvyn's extensive supporting evidence it still mischaracterizes the basic content of his asylum claim, largely limiting its analysis to the oral testimony of a child, diagnosed with post traumatic stress disorder (PTSD), and testifying about events that occurred when he was very young. A review of the record as a whole compels the conclusion that Celvyn is entitled to the protections afforded to refugees.

The majority's decision also raises a larger concern. By approving the administrative courts' failure to consider the substance of Celvyn's asylum claim and by essentially adopting this same approach itself, the majority avoids the obligation of our court system to treat children who seek refugee protection with the care and attention required by law, administrative guidance and international norms. This failure has resulted in a decision that is both legally incorrect and that inflicts a terrible human price on a child[11] who has turned to the United States for protection.

---

[11]The Immigration and National Act (INA) defines a "child" as an unmarried person under twenty-one years of age, meaning Celvyn, who is now eighteen, still qualifies as such. See INA §§ 101(b)(1)

Below, I first recount the factual basis of Celvyn's asylum claim, drawing as I must from the complete record. Second, I explain that a remand is required because the administrative courts failed to issue a merits decision on the claim actually presented by Celvyn. Third, I explain how the majority and the courts below misapplied the asylum standard to Celvyn's claim. Fourth, I explain how the record evidence compels the conclusion that Celvyn suffered persecution on account of his family's political activities and why he therefore should be granted asylum.

## I. The Factual Basis of Celvyn's Claim

The facts as drawn from the complete record are as follows. Celvyn's family has long been involved in political activism in their rural town of Arimis, in the province of Olancho, Honduras, and has suffered decades of persecution on account of that activity. Celvyn's step-grandfather, Angel Herrera, was a founding member of Lincol, a local activist organization of landless peasants that organized land takeovers and other actions which were legally permissible under Honduran land reform legislation of the time. Lincol was named after Lincoln Coleman, who was a land-reform leader in Olancho province and executive secretary of the League of Peasants of Olancho in the 1970s. The Lincol activists were opposed by the wealthy land-owning elite in the area. The landowners were aided and supported by the local police and military. In 1982 or

and 101(c)(1), 8 U.S.C. § 1101(b)(1) and (c)(1).

1983, Angel was killed by a group of soldiers because of his involvement in Lincol and the land reform movement. In 1982, another family member, the brother-in-law of Celvyn's mother's sister, was also killed for his involvement in the Lincol movement.

Celvyn's grandmother was an active and visible member of Lincol and the Liberal Party, a leftist political party supportive of land rights for landless peasants. In the 1970s, she was involved with Lincol through her husband Angel. She also supported the group during land invasions and other actions by delivering and selling food and sweets to the activists. She brought her young daughter, Celvyn's mother, along with her when she sold the food. Several years after her husband Angel's murder, Celvyn's grandmother put the Lincol beliefs into practice by squatting on an unused piece of land in the town of Arimis and building her home on it, which greatly antagonized her wealthy, land-owning neighbors. She flew the red Liberal Party flag above that home, while her wealthy neighbors flew the blue National Party flag.

The family continued to be targeted for its activism when Cevlyn's uncle, Carlos Augusto Romero Erazo, who was involved with Lincol, was murdered in 1996. He was killed by Gregorio ("Godo") Mejia, a cousin from the family that owned the land on which Celvyn's mother was squatting. The family reported the murder to the authorities, who issued a criminal indictment, but never arrested Godo or otherwise resolved the case. The earliest memory

that Celvyn testified about was witnessing the dead body of his uncle with a machete wound to the head, a significant traumatic event for a five-year-old child.

From his earliest memories, Celvyn recalls neighbors harassing and threatening his family for their political views. When Celvyn was three, his mother fled to the United States to escape a brutally abusive relationship with a member of one of the wealthy local families. Celvyn was left to live with his elderly grandmother and his two young cousins in the home in Arimis that sat on appropriated land. Though very young, he possessed an age-appropriate understanding of the political divisions between his family and their wealthy neighbors.

In addition to the trauma that he experienced at the age of five, when he witnessed his uncle's dead body, Celvyn was also repeatedly taunted and physically assaulted by a neighbor named Hubert Mejia, who was a member of the same wealthy family that owned the land on which Celvyn's grandmother was squatting. Hubert would throw stones at Celvyn when he was walking outside and on two occasions he brutally attacked the family when Celvyn, his grandmother, and his two young cousins were alone in the house. Hubert wielded a machete during both attacks. Though he did not understand the nuances, Celvyn perceived that Hubert, and other neighbors like him, did not like Celvyn's family because of political and economic disputes -- he noted that during the attacks

Hubert called him and his grandmother "Communists" and "people that are dying, that are starving."

Hubert's first violent assault on the family occurred when Celvyn was about ten years old, though the record is unclear on this point. During the attack, Hubert wielded a machete and chased Celvyn and his grandmother around the home, repeatedly punching and hitting Celvyn. Hubert threw his weapon at Celvyn, leaving a large, eight inch scar on Celvyn's right leg. A photo of the scar was entered into evidence.

Fearing for his safety after this assault, Celvyn's grandmother arranged for Celvyn and his two young cousins to leave Honduras and travel to the United States. However, Celvyn and his cousins were apprehended in El Salvador, presumably by Salvadoran authorities, and returned to Arimis. Following his return, Celvyn's grandmother kept him indoors and did not let him go to school, for fear of more violence from those opposed to her activism. In early 2002, when Celvyn was eleven, his grandmother's fears were substantiated when Hubert again attacked the family. This time, Hubert used a machete to ransack and destroy the entire house, slashing windows and the interior of the house. He also used his machete to cut down and destroy the agriculture and vegetation surrounding the house. Celvyn, his grandmother, and his young cousins were at home during the attack and feared for their lives. The violence toward the elderly grandmother and three young

children, along with the destruction of the home, were so overwhelming that when Celvyn's aunt (his mother's sister) saw the aftermath, she suffered a heart attack and died four days later. A death certificate for the aunt, admitted into evidence, showed that she died on April 2, 2002. Shortly after this second attack, Celvyn's grandmother successfully sent Celvyn to the United States.

Celvyn also testified, in an appropriately child-like way, that neither he nor his grandmother called the police to report the many assaults on the family because, "[t]he police wouldn't do anything here." He also testified that, "Where I was living, there was no police force." The family's belief that the authorities would not protect them was a conclusion based on decades of experience. The landowners who opposed the family's work with Lincol enjoyed the active support of the local police, and military and government soldiers had killed Celvyn's step-grandfather. When the family reported the uncle's murder in 1996, the authorities never arrested or prosecuted the landowner who was responsible. Indeed, the Department of State confirmed this trend, noting in its 1999 Country Report that the "local landowners" in Olancho province had formed "large-scale vigilante groups," apparently without resistance from the authorities.

In short, by 2002, Celvyn felt under siege, confined to his home, fearful of the next instance of violence from his neighbors and sure that no one could or would protect him. As he

put it, "[I]f I would be leaving the house, I assume that the one neighbors would get me on one side, the other neighbors would get me on the other side."

The violence inflicted on Celvyn because of his family's land reform activism was not the only physical and emotional trauma this young boy experienced in Arimis. As the record shows, Honduras suffers from a tremendous gang problem. Though he was very young, about eight or nine years old, Celvyn faced attempted recruitment by older gang members in his town. He resisted this recruitment and suffered terribly as a result. Gang members harassed him on his way to and from school, physically bullied him, and tried to steal his money. They also threw a snake at him, and he had to fend off sexual assaults from the same gang members. In the worst incident, gang members brought Celvyn to the roof of a small house and threw him down toward the ground, where he became entangled in barbed wire. He could not free himself and believed he had been left there to die. According to Celvyn's treating psychologist, he has visible scars from the barbed wire on his back and right arm. Fortuitously, a family friend, whom Celvyn called "Uncle," happened upon him and freed him from the barbed wire.

Finally, Celvyn and his mother testified consistently that if Celvyn were to return to Honduras he would have no one to care for him. All of his immediate and extended family members are either dead or live in the United States, with the exception of his

biological father and grandmother. As for the father, Celvyn repeatedly stated under probing cross-examination that his dad was an absentee father who never raised or cared for him and would not take care of him now. In addition, though his father had been deported to Honduras, neither Celvyn nor his mother knew where he was or had had any contact with him since his departure.

As for Celvyn's grandmother, she went into hiding in 2002, the year she sent Celvyn to the United States. The family did not hear from her for four years until one of Celvyn's aunts traveled to Honduras in 2006 to find her. According to Celvyn's mother's supplemental affidavit, the aunt found that the grandmother had returned to Arimis, was living in the same house on the appropriated land, was elderly and ill, and feared for her life. The grandmother reported that the wealthy neighbors had made it clear that they were opposed to her return to Arimis.

## II. Decisions Below

A review of the decisions issued by the IJ and the BIA shows that these administrative bodies failed to render a decision on the claim actually put forth by Celvyn, that he suffered persecution on account of a political opinion imputed to him based on his family's long-standing land reform activism. They only considered whether Celvyn suffered past persecution on account of a dispute with what they termed a "disgruntled neighbor." This was not Celvyn's claim. Worse, they drew exclusively from the child

-38-

applicant's oral testimony to determine the universe of facts supporting his claim. Given that the agency failed to address the actual claim and evidence put forth by Celvyn, this case should be remanded for consideration of the merits of the actual claim. See Gailius v. I.N.S., 147 F.3d 34, 44 (1st Cir. 1998) ("'[A] reviewing court . . . must judge the propriety of [administrative] action solely by the grounds invoked by the agency.'" (alteration in original) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947))); Citizens Awareness Network, Inc. v. United States, 391 F.3d 338, 349 (1st Cir. 2004) ("It is a bedrock principle that a court may only uphold an administrative action on a rationale advanced by the agency in the administrative proceeding.").

It is impossible to find anywhere in the BIA's very abbreviated opinion a discussion of the claim actually made by Celvyn or any consideration of his extensive supporting evidence. In its opinion, which amounts to one page of substantive text, the Board provides two sentences purporting to explain the factual basis of Celvyn's political persecution claim, which are worth quoting in full:

> In addition, his grandmother's neighbor, Hubert, destroyed his grandmother's house and would call the respondent names and throw stones at him. The respondent did not know why Hubert did such things.

This beggarly effort to set forth the basis of Celvyn's persecution claim does not rise to the bare minimum that we should expect from

a responsible administrative court.[12] The BIA grossly misstates the content of Celvyn's claim and refers only to Celvyn's oral testimony to discern the factual support for his claim. The Board went on to dismiss the political persecution claim in one sentence, opining that "the actions of a disgruntled neighbor . . . did not rise to the level of persecution." The BIA provided absolutely no analysis of Celvyn's actual claim, meaning there is no decision on the merits for the majority to review.

The IJ's opinion, though longer than the BIA's, is no better. The IJ did not analyze whether Celvyn's claim -- that he was persecuted on account of an imputed political opinion based on his family's decades of land reform activism -- rose to the level of the statutory definition for political asylum. The section of the IJ's opinion labeled "Past Persecution" reveals that the IJ limited the factual basis of Celvyn's claim to the following:

> The Respondent testified that "Hubert," his former neighbor in Honduras, destroyed his grandmother's home and windows with a machete, frequently called him a "Communist," threw stones at him, and on one occasion, hit him in the leg with a machete.

[12]The majority's citation to Raza v. Gonzales, 484 F.3d 125 (1st Cir. 2007), supports my view. We have required that the BIA, at a minimum, frame "its decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion." Id. at 128. Here, the BIA and the IJ have so completely misstated the factual basis of Celvyn's claim that it is plain that the agency has not adequately thought about the evidence and therefore could not have reached a reasoned conclusion.

Thus, the IJ ignored Celvyn's imputed political opinion claim and the extensive evidence of the family's decades of activism and resulting persecution. The above excerpt also shows that the IJ drew only from Celvyn's oral testimony to analyze his past persecution claim, ignoring the powerful supporting evidence introduced at trial.[13] Further, the IJ's conclusion about Celvyn's past persecution claim starkly shows that he simply did not consider the claim Celvyn actually put forth:

> While these events were, without a doubt, troubling, they amount to no more than a series of isolated altercations with a disgruntled neighbor.

This conclusion does not address Celvyn's claim or evidence. Finally, the IJ stated that:

> There is no evidence in the Record of Proceedings that the Respondent was ever physically punished for possessing a belief or characteristic that others sought to overcome.

This stunningly inaccurate statement reveals that the IJ simply did not consider Celvyn's assertion of imputed political opinion or his

---

[13]Because this is such an important point of disagreement with the majority, I have appended to my dissent the IJ's complete analysis of Celvyn's past persecution claim, which can be found on pages 17 and 18 of the IJ's opinion, under the heading "Past Persecution." Despite the majority's attempt to paper over the IJ's failure to review Celvyn's claim, the appended portion plainly does not include a review of Celvyn's claim or his supporting evidence. It is simply not there.

evidence of his family's decades-long land activism and resulting persecution.

Even though the IJ's decision plainly does not address Celvyn's claim, the majority thinks the IJ nonetheless did a good enough job because he (1) narrated the content of the mother's testimony in a section of the opinion entitled "Testimonial Evidence", and (2) included a list of the documentary evidence submitted by Celvyn and asserted that he had considered all such evidence. The problem, however, is that the IJ's analysis of Celvyn's past persecution claim, excerpted above and appended in full to this dissent, gives zero indication that the IJ actually considered Celvyn's imputed political opinion claim or that he took into account the evidence submitted in support of that claim. The IJ committed a basic error by not considering the claim actually put forth by the applicant, and the majority has chosen to excuse the IJ's failure. Quite simply, Celvyn was entitled to receive a merits decision on the claim and evidence he submitted to the immigration court. Thus, remand is necessary.

### III. The Merits of Celvyn's Asylum Claim

My preliminary objection, as noted above, is that Celvyn's claim did not receive due consideration below, thus requiring a remand. However, even if the courts below issued a valid merits decision, I believe a review of the entire record shows there is not substantial evidence to support the denial of Celvyn's asylum claim.

And though our standard of review is highly deferential in asylum cases, the evidence presented in this case indeed compels the conclusion that Celvyn suffered past persecution on account of an imputed political opinion. The administrative courts below reached the opposite conclusion by relying exclusively upon the oral testimony of a young child diagnosed with PTSD rather than considering the record as a whole, which is strongly supportive of his claim of persecution. Relying on oral testimony while ignoring other strongly supportive record evidence was precisely the basis of our remand in Mukamusoni v. Ashcroft, 390 F.3d 110, 120-21 (1st Cir. 2004), and should be here as well.

Further, in ignoring Celvyn's persuasive supporting evidence, the courts below violated case law, administrative guidance, and international norms regarding how courts should analyze children's asylum claims.

## A. Asylum Standard

Because the majority's discussion of the standard for political asylum is incomplete, I relate the full test below. An applicant may establish eligibility for asylum based on past persecution alone. See 8 CFR § 1208.13(b). A finding of past persecution gives rise to a presumption that the applicant also has a well-founded fear of future persecution. See id. § 1208.13(b)(1). This presumption can only be rebutted by a showing that either changed circumstances have rendered the fear of future persecution

moot or that by relocating to another part of the country the applicant can avoid future persecution. See id. § 1208.13(b)(1)(i). Even if the presumption is successfully rebutted, the applicant may still be granted asylum if (1) the applicant has demonstrated a compelling reason for being unwilling or unable to return to his country arising out of the severity of the past persecution, or (2) the applicant has established a reasonable possibility that he may suffer other serious harm upon removal to his home country. See id. § 1208.13(b)(1)(iii).

As for our standard of review, we review the factual findings below for substantial evidence, meaning we must ask whether the lower courts' conclusions are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Rivas-Mira v. Holder, 2009 WL 323469, at *4 (1st Cir. February 11, 2009) (emphasis added). Importantly, "deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole." Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994) (emphasis added). Importantly, we have found reversible legal and factual error where the BIA only drew on the respondent's oral testimony and ignored significant supporting evidence, including the respondent's affidavit. See Mukamusoni v. Ashcroft, 390 F.3d 110, 120-21 (1st Cir. 2004).

## B. Age and Mental Status of the Respondent

The IJ found Celvyn's testimony credible. However, the quality of the information Celvyn was able to relay in his oral testimony was undermined by three significant factors, none of which was considered by the IJ or the BIA. First, Celvyn's testimony recounted events that occurred when he was between the age of five, when he witnessed the machete-wounded body of his murdered uncle, and eleven, when he fled Honduras. Second, Celvyn gave his oral testimony when he was just thirteen and in the fifth grade. Third, prior to his oral testimony, Celvyn was diagnosed by a psychologist at the Cambridge Health Alliance with post traumatic stress disorder, which she concluded was caused by "exposure to traumatic events" in Honduras, including being "hung on a barb wire fence," being "cut with a machete," and experiencing "death threats, attempted rapes and other forms of violence where he feared for his life."[14]

---

[14]The doctor's evaluation is the only evidence in the record pertaining to Celvyn's mental health. Nonetheless, the IJ dismissed the doctor's conclusion as to the cause of Celvyn's PTSD based on pure speculation. The IJ mused that there was no evidence in the record that Celvyn's PTSD was caused by the "encounters" with the neighbors and the gang members rather than "perhaps, the difficulties involved in traveling unaccompanied to the United States." In other words, the IJ dismissed the expert's uncontested causal diagnosis of Celvyn's PTSD based on nothing more than the IJ's own personal guess that perhaps Celvyn's trauma might have been caused by his travel to the United States. The majority, in turn, adopts the IJ's speculative stance on this issue in spite of the uncontested record evidence identifying the source of Celvyn's PTSD. The majority's acrobatic attempts to get around the clear and uncontested findings of the medical professional violate our

When children seek asylum, the courts must approach their cases with particular care for a variety of reasons. First, as case law and U.S. Department of Justice policy reflect, a child experiences traumatic events in ways that are different from an adult, and a child is less likely to understand and to be able to explain the reasons that violence has been inflicted upon him. See, e.g., Civil v. I.N.S., 140 F.3d 52, 62 (1st Cir. 1998) (dissenting opinion); Kahssai v. I.N.S., 16 F.3d 323, 329 (9th Cir. 1994); "Guidelines for Children's Asylum Claims," U.S. Department of Justice, INS Policy and Procedure Memorandum ("1998 DOJ Memo"), December 10, 1998, available at 1998 WL 34032561 ("The harm a child fears or has suffered . . . may be relatively less than that of an adult and still qualify as persecution."). For this reason, the U.S. Department of Justice has mandated that, when considering a child's asylum claim, an immigration judge must, among other things, evaluate the child's testimony in light of his age, development, and experience:

> Judges should recognize that children, especially young children, usually will not be able to present testimony with the same degree of precision as adults. Do not assume that inconsistencies are proof of dishonesty, and recognize that a child's testimony may be

case law and are surprising. See Cordero-Trejo, 40 F.3d at 487 (deference to BIA "is not due where findings and conclusions are based on . . . merely personal views of the immigration judge") (citations omitted). A simple reading of the psychological report leaves no doubt that Celvyn's PTSD was caused by the extreme violence he experienced in Honduras at such a young age.

-46-

> limited not only by his or her ability to
> understand what happened, but also by his or
> her skill in describing the events in a way
> that is intelligible to adults.

"Interim Operating Policies and Procedures Memorandum 04-07," U.S. Department of Justice, September 16, 2004. Because of the difficulty a child is likely to have in explaining what happened to him and why,[15] the United Nations High Commissioner for Refugees (UNHCR) has advised that asylum adjudicators should give additional

---

[15]An in-depth report from Harvard University on minors seeking asylum in the United States provides anecdotal examples of this difficulty:

> For children, presenting their own evidence can be difficult. One asylum officer recounted a compelling case involving a 10-year-old girl whose father worked for a corrupt politician. Because the father knew compromising information about the politician, both parents were assassinated while the father was still employed by this politician. During her asylum interview, the orphaned girl focused primarily on the computer that her father would bring home from work rather than on the political context that had destroyed the family. Fortunately, news accounts of the parents' assassination--supplied by supportive adults who realized their relevance--existed to corroborate and fill out the child's story. In another case, a Quality Assurance and Training Officer recalled that a child was asked "Why did they kill your uncle?" The child responded, "To make my grandmother sad." Though children may be eligible for asylum, providing the evidence to support the claim may be impossible. As another asylum officer commented on the challenge of relying on children's memory, "A lot of what sticks isn't what we need."

"Seeking Asylum Alone in the United States," J. Bhabha & S. Schmidt, June 2006, available at www.humanrights.harvard.edu/images/pdf_files/Seeking_Asylum_Alone _US_Report.pdf.

weight to objective evidence in order to supplement the child's own subjective testimony:

> Although the same definition of a refugee applies to all individuals regardless of their age, in the examination of the factual elements of the claim of an unaccompanied child, particular regard should be given to circumstances such as the child's stage of development, his/her possibly limited knowledge of conditions in the country of origin, and their significance to the legal concept of refugee status, as well as his/her special vulnerability. Children may manifest their fears in ways different from adults. Therefore, in the examination of their claims, <u>it may be necessary to have greater regard to certain objective factors</u>, and to determine, based upon these factors, whether a child may be presumed to have a well-founded fear of persecution.

UNHCR, "Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum," February 1997, 12-13 (emphasis added). Nor is this guidance unique to the immigration context. It has numerous correlates in other areas of juvenile justice. <u>See</u> Kristine K. Nogosek, "It Takes a World to Raise a Child: A Legal and Public Policy Analysis of American Asylum Legal Standards and Their Impact on Unaccompanied Minor Asylees," 24 Hamline L. Rev. 1, 13-17 (2000) (outlining the protections and assistance afforded to children in other areas of law, including contract, tort, and criminal law).

In Celvyn's case, the IJ[16] and the BIA limited their accounts of the basis of Celvyn's asylum claim to the oral testimony given by this young boy. Limiting review to such a small portion of the record would be inexcusable in any case, see Mukamusoni, 390 F.3d at 120-21, but it is particularly so in a case involving a minor. Reading the transcript of Celvyn's oral testimony, one finds that it is exactly what one would expect from a thirteen-year-old discussing events that occurred when he was five to eleven years old. His description of multiple incidents of violence is simplistic;[17] he can only offer basic explanations for why such

_____

[16]In his analysis of the past persecution issue, the IJ stated that he considered the fact that children may experience persecution in ways that are different from adults. However, the IJ's supposed consideration of Celvyn's age was meaningless given that the IJ did not address Celvyn's imputed persecution claim, only drew upon the child's oral testimony, and ignored the extensive evidentiary support for his claim. In effect, despite Celvyn's age, the IJ required him to carry his asylum burden through his oral testimony alone. It should not be enough, as the majority apparently believes, for the IJ to merely state he has taken age into account. Where the written decision plainly shows that the IJ neither considered the child applicant's imputed political opinion claim nor considered his extensive supporting evidence, accepting at face value the IJ's assurance that he has factored in age amounts to placing form over substance. I would require that the IJ demonstrate through his analysis that this factor was taken into account. There is a big difference between these two. Using magic words should not be enough.

[17]For example, relating one of his neighbor's violent machete attacks against himself and his elderly grandmother, Celvyn's story-telling was very simple:

Q: Did he ever harm you?
A: Yes.
Q: What kind of things did he do to you?
A: One, once, this day, I was running because he was hitting me and he threw a machete at me.

-49-

violence was inflicted upon him and his family;[18] and he shows only a very basic, one might say "child-like," understanding of the political context of the trauma that engulfed his young life.[19]

---

Q: And what happened when he threw the machete at you?
A: He hit me here.
. . .
A: He grabbed the machete and he threw it against me and the machete ends up, ended up this way.

[18]For example, during cross-examination, Celvyn tried to explain why almost all of his family members had fled Honduras. He clearly understood that there was something systematic about the violence inflicted on his family, but his explanation of the larger context is limited by his age and development:

Q: Okay. And did your grandmother tell you why your mom and father came to the United States?
A: They went through the same thing I went through. Before, when she was in Honduras, also the family, the boys, the neighbor, they would bother our family and that's the reason all of them, almost all of them came here.
Q: Okay. Who told you that?
A: My mother. She knows that. She told me that.
. . .
A: When I told her what happened to me, she told me the same thing happened to me.

[19]Again on cross-examination, the government attorney probed the "on-account-of" element of the asylum standard. Celvyn knew that his neighbors called him and his family "Communists" but, in a textbook example of what constitutes a purely imputed political opinion, he stated that he did not even know what that word meant:

Q: Okay. And do you know why Hubert didn't like your grandmother?
A: No.
Q: Do you know why he said Communists?
A: I don't know what that word means.
Q: Okay. And did you hear it yourself or did someone tell you that's what he said?
A: He stated Communists.
Q: And you don't know what he meant by that?
A: No.

Despite this, three courts have ignored the voluminous additional evidence that explains in great detail the political causes of the violence that Celvyn and his family experienced. The IJ, BIA, and now, to a large extent, the majority have contented themselves with quoting from Celvyn's simplistic oral testimony, using such quotations to purportedly show that there really is no meat on the bones of his asylum claim. This strikes me as particularly troubling given that the respondent is a young child who, by virtue of his age and development, simply cannot carry his asylum burden based on his oral testimony alone.

## C. The Record Evidence

In this section, I expand upon the sources of evidence contained in the 1,800-plus page record, evidence that was ignored by the IJ and BIA and inadequately considered by the majority.

1. The Mother's Oral Testimony

Celvyn's mother's testimony explained what Celvyn, by virtue of his age, could not. In short, the mother explained (a) the severity and pervasive nature of the trauma that Celvyn experienced, which goes to past persecution; (b) how the on-going trauma that he experienced was the result of the family's political activism, which goes to the on-account-of element; and (c) how the government was unwilling or unable to protect the family, and at times even complicit in carrying out the persecution.

In order to conclude that Celvyn did not present sufficient evidence to compel the conclusion that he qualifies for asylum, the majority must explain away the validity of the powerful evidence contained in the mother's testimony. It does so by misinterpreting the IJ's findings as to the credibility and reliability of the mother's testimony. Because this is such an important issue, I quote the immigration judge's complete findings as to the mother's testimony, who is referred to as Ms. Romero:

> The court notes that Ms. Romero's testimony was often unclear and contained numerous inconsistencies as compared to her Application for Asylum, especially with regard to the reasons why she fled Honduras and her family's involvement with the "Lincol" organization. Those discrepancies contained in Ms. Del Carmen Romero's testimony speak more to whether Ms. Del Carmen Romero was credible in her own Application for Asylum, rather than whether the Respondent is credible, especially since her testimony otherwise generally corroborated the Respondent's testimony. As the inconsistencies and discrepancies contained in Ms. Del Carmen Romero's testimony do not affect the heart of the Respondent's asylum claim or his overall narrative of "Hubert's" actions or the actions of the "Maras," they therefore do not prompt a negative credibility finding for the Respondent.

The IJ here made findings on three separate credibility questions: (1) the credibility of Romero as to her own asylum claim; (2) the impact of Romero's inconsistencies on Celvyn's credibility; and (3) the reliability of Romero's evidence as it related to the factual basis of Celvyn's asylum claim. I take each in turn.

-52-

First, the IJ found that Romero's testimony contained inconsistencies between what she placed in her own written asylum application, which was filed in 1996, and what she testified to orally at Celvyn's asylum hearing in 2005. There is no question that this is true. Romero, as she explained herself, attempted to get work authorization papers after she arrived in the United States. She paid a "notary public" named "Carolina" to fill out papers on her behalf in English, papers that Romero could not read and which were not read back to her in Spanish. Romero thought it was a work permit application but in fact it was an asylum application. The information "Carolina" put on the form was filled with inaccuracies, as Romero freely admitted during oral testimony. As the government pointed out later in cross-examination, this same "Carolina" was arrested for immigration fraud at a later date.

Therefore, the IJ's comment that there were inconsistencies between Romero's oral testimony at Celvyn's hearing and her previously-adjudicated asylum application is absolutely correct. However, the IJ rightly concluded that this bore solely on Romero's credibility as related to her own asylum claim. And because her own asylum claim had already been adjudicated years prior and was in no way at issue in Celvyn's case, this was a conclusion about a prior legal claim that had no legal relevance to the present proceedings.

Second, because the IJ found that Romero's testimony "otherwise generally corroborated" Celvyn's testimony, he found that the inconsistencies between her oral testimony at Celvyn's trial and her admittedly inaccurate, previously-adjudicated asylum claim had no negative impact on Celvyn's credibility. This, too, was a fair conclusion, and one that bolsters Celvyn's claim.

Third, as to the reliability of Romero's testimony with regard to Celvyn's asylum claim, the IJ plainly found her testimony consistent with Celvyn's and therefore reliable. As the IJ said, he found that her testimony "generally corroborated" Celvyn's testimony. He also found that any inconsistencies between her testimony at Celvyn's trial and her own asylum claim did not "affect the heart of the Respondent's asylum claim or his overall narrative." Thus, her testimony as related to Celvyn's claim is rightly before this court for review.[20]

The majority asserts that "the IJ did not . . . make explicit credibility findings regarding the mother's . . . testimony." However, as I have shown, the text from the IJ's

_____

[20]As to the aunt's testimony, the IJ properly took into account that the aunt failed to appear for cross-examination after her initial testimony was taken. It is worth noting, however, that her testimony as to the family's long-running political activism with Lincol and the Liberal Party and the resulting violence was consistent with Celvyn's testimony, Celvyn's mother's testimony, and the extensive supporting evidence submitted in the case.

-54-

opinion plainly contradicts this contention.[21]  Because the majority

misreads the IJ's findings, it discounts the entirety of the

mother's testimony, leaving the child's oral testimony to stand

alone as the only oral testimony considered by the majority.  The

majority erred in doing so, particularly given that Celvyn's age

imposed a duty on the court to broadly consult all available and

reliable evidence to understand his claim.[22]

---

[21]The majority also concludes, without citation to the record, that the IJ and BIA "implicitly rejected those portions of Mejilla-Romero's mother's and aunt's narratives that indicated Hubert's actions toward petitioner" were part of a broader political dispute.  This is simply not true and the majority can cite to nothing in the record so suggesting.  What the IJ and BIA did was fail to consider the claim Celvyn actually put forth or review the record as a whole regarding his claim.  The IJ found that the mother's testimony was generally consistent and reliable regarding the heart of Celvyn's claim, yet her testimony was not considered. Further, the record is otherwise replete with explanations of the broader political context of the family's persecution, including Celvyn's testimony and the extensive supporting documentation presented by Celvyn.  Yet neither the IJ nor the BIA drew on any of this material evidence.  In other words, the IJ and BIA did not "implicitly reject" this evidence; they simply ignored it in its entirety.  Indeed, that is the crux of the problem in this case.

[22]I also note that the majority tries a second tactic to dismiss the mother's testimony.  It argues that the mother was "inconsistent" as to whether Lincol was the activist group with which the family was aligned, or whether it was the group persecuting the land activists.  The breadth and depth of the mother's testimony and affidavit, the aunt's testimony and affidavit, and the significant supporting evidence from scholars and other affiants shows that the family members were active Lincol members and were persecuted on this ground.  There were, however, a few times in the mother's oral testimony where her answers were translated so as to suggest that the family was persecuted by Lincol, rather than because of membership in Lincol.  However, Celvyn's attorney objected on the record several times to just this translation.  As his lawyer explained, in Spanish the word "por" means both "by" and "because of."  Any inconsistencies in the mother's testimony were the result of a translation error to which

2. Other Supporting Evidence

In addition to the mother's testimony, Celvyn also presented unusually strong supporting evidence of his claim. These documents include the following. (1) A written report from Dr. Angela Radan, Cambridge Health Alliance, diagnosing Celvyn with PTSD because of the specific traumatic events that form the basis of his asylum claim.[23] (2) An affidavit from a Honduran attorney with an LLM from Harvard University and an expertise in Honduran human rights. She lays out the history of land reform struggles in Olancho province, the citizen groups like Lincol that engaged in land invasions and were "met with violent resistance" by land-holding families, supported by "local police and military authorities," and the political violence spurred by the contest between the Liberal and National parties.[24] (3) An affidavit from Mark Bonta, Professor of Geography at Delta State University, an expert on land conflicts in Olancho province, who spent four years in Olancho researching the political strife over land ownership in the area. He details the history of the formation of the Lincol

Celvyn's attorney objected. The majority ought not rely on a few instances of objected-to translation errors as a basis for dismissing the mother's testimony, particularly where the asylum applicant is a minor and cannot himself adequately explain why he was harmed.

[23]The government waived its right to cross-examine Dr. Radan, leaving her affidavit uncontested in the record.

[24]The government also waived cross-examination as to this affiant, leaving her affidavit uncontested in the record.

group in the 1970s, the death of the group's founder Lincoln Coleman in the Horcones/Santa Clara massacre in 1975, the on-going political dispute over land in Olancho between peasants and landowners, backed by the military, and the violent political repression inflicted on activists because of their work for land reform.[25]   (4) Supporting documentation about the Horcones/Santa Clara massacre.  (5) Celvyn's affidavit, which recounts in age-appropriate terms that his family had long-running problems with wealthy neighbors related to land issues and politics.   (6)  The affidavit of Celvyn's mother, detailing  the  family's  political  activism  with  Lincol  and  the resulting violence they experienced.  (7) A supplemental affidavit from Celvyn's mother declaring that Celvyn's grandmother had been located after four years in hiding, that she had returned to her home in Arimis, was very ill, and was fearful for her life because her wealthy neighbors were opposed to her return.  (8) A 1996 death certificate for Celvyn's uncle indicating that he was killed by a machete wound, and a criminal indictment issued for Saul Gregorio ("Godo") Mejia for the murder.  (9) Affidavits from Erin Scheick,[26] a  scholar  with  expertise  in  gang  recruitment  and  violence  in Honduras, and Gustavo Zelaya, legal counsel for Casa Alianza, the

---

[25]Celvyn made a written motion to allow telephonic testimony from Professor Bonta.  It appears from the record that the IJ never decided the motion.

[26]The government waived cross-examination as to this affiant as well.

leading advocacy organization for street children in Honduras, discussing the risks Celvyn faces if he is returned to Honduras.

The IJ's opinion fails to review the content of this evidence,[27] and the BIA, in its cursory two-page opinion, neither mentions nor considers any of the above evidence. The majority attempts to remedy the administrative courts' failure to consider the record as a whole by making some attempt to reference this material. But mere citation is a far cry from analysis. Further, the majority dismisses the relevance of important portions of Celvyn's supporting evidence merely because Celvyn's oral testimony did not refer to the same material.[28]

**D. Celvyn's Eligibility for Asylum**

1. The Past Persecution Claim

---

[27]The IJ does list all of the exhibits entered into evidence, and briefly mentions that the supporting evidence "bolster[s] the credibility of [Celvyn's] testimony." But the IJ does not discuss the content of the evidence as it relates to the factual basis of Celvyn's past persecution claim, as the appended portion of the IJ's decision shows.

[28]For example, the majority dismisses the relevance of Celvyn's affidavit because Celvyn "did not mention these events in his subsequent testimony before the IJ and indeed testified that he did not know why Hubert threw stones at him or did not like his grandmother." (emphasis added). Here, again, the majority takes Celvyn's inherent disability, namely his age-related difficulty in explaining orally the trauma he endured and the political reasons for it, and uses that as an excuse to dismiss other forms of evidence, rather than as a reason to give particular care and consideration to his supporting forms of proof. In other words, the majority uses Celvyn's disability to exclude rather than include additional evidence, which turns the rule governing the consideration of juvenile asylum applications on its head.

In contrast to the majority, I conclude from my review of the record that there is not substantial evidence to support the lower courts' conclusion that Celvyn did not suffer past persecution on account of imputed political opinion. More than that, I believe the record compels the opposite conclusion and that substantial evidence supports the conclusion that Celvyn suffered past persecution and has otherwise met his asylum burden. See I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992) ("To reverse the BIA finding we must find that the evidence not only supports that conclusion, but compels it."); Bellido v. Ashcroft, 367 F.3d 840, 846 (8th Cir. 2004) (reversing BIA's denial of asylum, finding substantial evidence support for granting asylum, and remanding for proceedings consistent with opinion); Osorio v. I.N.S., 18 F.3d 1017, 1023, 1033 (2d Cir. 1994) (reversing BIA denial of asylum, finding that applicant has met his burden in "demonstrating eligibility for political asylum," and ordering grant of asylum and withholding of deportation).

There is no doubt that Celvyn's family was deeply engaged in advocating for land reform for several decades in their community, and that this activism led to severe reprisals, including several assassinations of family members. Celvyn found himself living with the family's elderly matriarch, who was an active and visible political activist, and as a result Celvyn suffered the same persecution that his many family members had, merely because of a

political opinion imputed to him.  See Vasquez v. I.N.S., 177 F.3d 62, 65 (1st Cir. 1999) ("An imputed political opinion, whether correctly or incorrectly attributed, may constitute a reason for political persecution within the meaning of the [Immigration and Nationality] Act.") (quoting Ravindran v. I.N.S., 976 F.2d 754, 760 (1st Cir. 1992)); Mema v. Gonzalez, 474 F.3d 412, 417 (7th Cir. 2007) ("[A]sylum is available to persons who have been persecuted based on imputed political opinion, including situations where a persecutor attributes the political opinion of one or more family members to the asylum applicant.") (emphasis in original); Ananeh-Firempong v. I.N.S., 766 F.2d 621, 627 (1st Cir. 1985) (same).

As the Justice Department has concluded, a child's claim of past persecution can "be based on imputed political opinion." See "1998 DOJ Memo," available at 1998 WL 34032561.  In fact, the Department advises that an "adjudicator should carefully review the family history of the child" where the child claims persecution on account of an imputed political opinion.  Id. (emphasis added). That is precisely the review that was lacking in this case.

In addition, unlike the majority, I believe the threats and violence that Celvyn experienced on account of an imputed political opinion rose to the level of persecution. Celvyn, who was a young child in elementary school at the time, was physically assaulted on two occasions by a man wielding a machete.  The record shows that he bears the physical and psychological wounds of that

-60-

violence to this day.  Such brutal attacks on a very young child, whose only protection was his elderly grandmother, obviously rise well above our requirement that the harm "add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment." Nikijuluw v. Gonzalez, 427 F.3d 115, 120 (1st Cir. 2005).  By the time his grandmother decided to send him out of Honduras, Celvyn had become a prisoner in his own home, unable to go outside or attend school for fear of further violence.  That he was merely eleven at the time only heightens the conclusion that this boy suffered tremendous persecution for imputed beliefs that, quite tragically, he did not even understand.

Further, Celvyn's claim easily meets the requirement that the harm be the direct result of "government action, government-supported action, or government's unwillingness or inability to control private conduct."  Nikijuluw, 427 F.3d at 121.  The record evidence shows that the local police and government were strongly supportive of the land-owning elite who persecuted Celvyn's family for decades, and that Celvyn's step-grandfather's murder was carried out by government soldiers.  Moreover, the family reported the 1996 murder of Celvyn's uncle, but the authorities took no steps to arrest the perpetrator.  The 1999 Country Report confirmed the existence of large-scale, land-owner vigilante groups in Olancho that apparently operated with impunity.  All these facts led the

family to reasonably conclude that the authorities had not in the past and would not in the future protect them.[29]

2. Well-Founded Fear of Future Persecution

Because in my view Celvyn has established that the evidence compels the conclusion that he suffered past persecution on account of imputed political opinion, he is entitled to the presumption that he has a well-founded fear of future persecution. That presumption can only be rebutted by a showing, by a preponderance, that changed circumstances have rendered the fear of future persecution moot or that by relocating to another part of the country the applicant can avoid future persecution. See 8 CFR § 1208.13(b)(1)(i). Only the second showing is at issue here.

The legal standard on relocation is not a hypothetical one, but one rooted in the realities of the applicant's situation and the extant country conditions. The regulations provide that the presumption of a well-founded fear is rebutted if "[t]he applicant

---

[29]The majority's assertion that Celvyn did not "present any evidence that the Honduran government was unwilling to prosecute his assailants," is not supported by a review of the record as a whole. In addition, where there is evidence, as in this case, that the governing authorities are complicit in the persecution and have failed to provide protection in the past, there is no requirement that the applicant have reported further incidents of harm to those very same authorities. See, e.g., In re S-A-, 22 I & N Dec. 1328, 1335 (BIA 2000) ("[T]he evidence convinces us that even if the respondent had turned to the government for help, Moroccan authorities would have been unable or unwilling to control her father's conduct."). Indeed, a reporting requirement would exclude many of the most deserving asylum applications because it is common sense not to report persecution to government officials who one has reason to believe are cooperating with the persecutors.

could avoid future persecution by relocating to another part of the applicant's country of nationality . . . <u>and under all the circumstances, it would be reasonable to expect the applicant to do so.</u>" 8 CFR 208.13(b)(i)(B) (emphasis added). In Celvyn's case, such a conclusion is simply not reasonable.

Celvyn is still a child. If he returns to Honduras he has only two family members with whom he could conceivably live, his grandmother and his father. It is unreasonable to expect Celvyn to relocate with his father because, as discussed above, he has never cared for Celvyn, and there is no reason to believe he would today. It is equally unreasonable to expect his elderly, ill grandmother to relocate with Celvyn to another part of the country. Given that he has no other means, if Celvyn cannot live with either of these adults, it is almost a foregone conclusion that he would live on the street somewhere in Honduras. Further, the record is clear about the tremendous problems facing street children in Honduras, including persecution by the police.

3. Humanitarian Exceptions

However, even if relocation were found to be reasonable, I believe Celvyn qualifies for humanitarian protection. Celvyn has both (a) demonstrated a compelling reason for being unwilling or unable to return to his country arising out of the severity of the past persecution, and (2) has established a reasonable possibility that he may suffer other serious harm upon removal to Honduras. <u>See</u>

8 CFR § 1208.13(b)(1)(iii); see also In re Matter of Chen, 20 I. & N. Dec. 16, 19 (BIA 1989); Lal v. I.N.S., 255 F.3d 998, 1009 (9th Cir. 2001) ("The Matter of Chen exception is an expression of humanitarian considerations that sometimes past persecution is so horrific that the march of time and the ebb and flow of political tides cannot efface the fear in the mind of the persecuted."); Sheriff v. Att'y Gen., 587 F.3d 584, 593 n.6 (3d Cir. 2009) (noting that Matter of Chen involved persecution of an eight-year-old boy on account of his father's religious activities).

As for the first ground, Celvyn is a child who suffers post traumatic stress disorder caused by the extreme violence he experienced in Honduras, and his family lives in the United States. He has presented a compelling reason, rooted in the severity of the past persecution, not to be returned to Honduras. As to the second ground, Celvyn has demonstrated a reasonable possibility that he would suffer other serious harm were he returned to Honduras because he would likely live alone on the streets of Honduras, subject to well-documented abuses and gang recruitment. His mental illness and lack of family would make him especially vulnerable. In sum, even if the presumption of a well-founded fear were rebutted, Celvyn's case is just the type for which these humanitarian exceptions were created.

### III. Conclusion

In this case, the IJ and BIA failed to issue a merits decision on the claim put forth by Celvyn, which requires, at minimum, a remand. In addition, on the merits, the IJ, the BIA, and the majority have discounted the vast majority of Celvyn's supporting evidence, limiting themselves to the simple oral testimony of a child of thirteen recounting events that occurred when he was between five and eleven years of age. Because Celvyn's claim is based on imputed political opinion due to his family's political activism, a review of his family history was necessary. It was incumbent on this court, and those below, to examine the record as a whole to understand the factual basis of his claim. Of course, we are required to review the entire record in all cases, but that is particularly true in a case involving a minor.

When all is said and done, the majority essentially relies on our standard of review in order to affirm the decisions below. The argument is basically that our hands are tied, regardless of how unfortunate this young child's experiences may have been. However, if this is not a case where we can reverse a denial of asylum, I have trouble imagining the set of facts that would permit such a reversal. In my view, this court has allowed the standard of review in asylum cases to become an ever more impermeable barrier to any

meaningful appellate review.[30]   Quoting from Judge Carnes on the

Eleventh Circuit:

> The majority opinion refers to the often-mentioned, but never sighted, "rare case" in which the facts are so compelling that we will reverse an immigration judge's finding that a petitioner has failed to prove persecution on a protected ground. . . . [T]oday's decision indicates that such a case, like the fabled unicorn, exists only in our imagination.

Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1248-49 (11th Cir. 2006)

(Carnes, J., dissenting).  I therefore dissent.

---

[30]It is instructive to review data from the Department of Justice, Executive Office for Immigration Review, which shows that this circuit is among the least likely to reverse a decision of the BIA.  For example, in 2006, the average reversal rate for all circuits was 17.5%, while the First Circuit reversed in just 7.1% of cases, making it the third least likely circuit to reverse. See http://www.justice.gov/eoir/vll/ILA-Newsleter/ILA%20Vol%202/vol2no1.pdf.  In 2007, the average reversal rate for all circuits was 15.3%, while the First Circuit reversed in only 3.8% of cases, placing it dead last. Id.  In 2008, the average reversal rate for all circuits was 12.6%, while the First Circuit reversed in just 4.2% of cases, placing it second from the bottom.  See http://www.justice.gov/eoir/vll/ILA-Newsleter/ILA%202009/vol3no1.pdf.  For the first ten months of 2009, the average reversal rate was 11.5%, while the First Circuit reversed in 4.8% of cases, making it the fourth least likely circuit to reverse.  See http://www.justice.gov/eoir/vll/ILA-Newsleter/ILA%202009/vol3no11.pdf.

**APPENDIX**

**DECISION OF THE IMMIGRATION JUDGE**

. . . .

## 3. Past Persecution

The events as recounted by the Respondent do not establish that he was persecuted in the past. The Respondent testified that "Hubert," his former neighbor in Honduras, destroyed his grandmother's home and windows with a machete, frequently called him a "Communist," threw stones at him, and on one occasion, hit him in the leg with a machete. The Respondent also testified that he had difficulties with "Maras," gangs of fifteen year old boys from the neighboring village, when they pushed him and attempted to steal his money. At one point, these boys also threw the Respondent from a small house, causing him to become entangled in a wire.

Behaviors that an adult may not typically associate with persecution or serious harm may produce lasting damage or physical or psychological trauma in a child and thus constitute persecution. See Civil v. INS, 140 F.3d 52, 62-63 (1st Cir. 1998) (dissenting opinion). However, after a careful review of the Record of Proceedings (and bearing in mind the Respondent's age at the time these events occurred), the Court concludes that the Respondent did not suffer from past persecution. While these events were, without a doubt, troubling, they amount to no more than a series of isolated

altercations with a disgruntled neighbor and with a group of boys who bullied younger children into providing them with money.  See Awad, 463 F.3d at 76 (harassment and bullying does not amount to persecution).  There is no evidence in the Record of Proceedings that the Respondent was ever physically punished for possessing a belief or characteristic that others sought to overcome.  Nor is there any evidence that encounters with "Hubert" or the "Maras" -- and not, perhaps, the difficulties involved in traveling unaccompanied to the United States -- caused the Respondent such lasting psychological trauma so as to rise to the level of past persecution. Cf. Exhibit 6 (psychological evaluation diagnosing the Respondent with Post-Traumatic Stress Disorder).  Accordingly, this Court finds that the Respondent did not suffer past persecution.

. . . .